COPY

ORIGINAL

# UNITED STATES DISTRICT COURT

for the

_Northern_ District of _Texas_

_Dallas_ Division

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2021 SEP 21  PM 4: 18

DEPUTY CLERK __

Case No. **3-21CV2252-N**

*(to be filled in by the Clerk's Office)*

Marco A. Montemayor
_____
Plaintiff(s)

*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

-v-

Neptune Ventures LLC,
_____
Defendant(s)

*(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DEPUTY CLERK __  MS  2021 SEP 28  PM 2:33  CLERK US DISTRICT COURT NORTHERN DIST OF TX FILED

Emergency
Amendment

# COMPLAINT AND REQUEST FOR INJUNCTION,

OBJECTION TO DENIED ORDER in RECORD
Recommendation

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if
needed.

| | |
|---|---|
| Name | Marco L Montemayor |
| Street Address | 2805 Cornell Cir. |
| City and County | Irving, Dallas |
| State and Zip Code | Texas  75062 |
| Telephone Number | 469-735-6306 |
| E-mail Address | MMTRI777@gmail.com |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an
individual, a government agency, an organization, or a corporation. For an individual defendant,
include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 3 (Rev. 12/16) Complaint and Request for Injunction

Defendant No. 1

Name NINA Chudasama

Job or Title *(if known)* Officer Neptune Ventures, LLC

Street Address 2451 W. Grapevine Mills Cir. Ste 650

City and County Grapevine    TARRANT

State and Zip Code Texas    76051

Telephone Number 972 821-2735

E-mail Address *(if known)* Neptune ventures @fp

Defendant No. 2

Name Daniel W. Brooks

Job or Title *(if known)* Trustee / Independant Bank

Street Address 7777 Henneman Way

City and County McKinney, Collin

State and Zip Code Texas   75070-1711

Telephone Number (972) 562-9004

E-mail Address *(if known)*

Defendant No. 3

Name David R Brooks

Job or Title *(if known)* CEO of Independent Bank

Street Address 7777 Henneman Way

City and County McKinney, Collin

State and Zip Code Texas   75070-1711

Telephone Number (972) 562-9004

E-mail Address *(if known)*

Defendant No. 4

Name John Romeo

Job or Title *(if known)* Real ESTATE AGENT

Street Address

City and County Irving    Dallas

State and Zip Code Texas   75062

Telephone Number (214) 223-8775

E-mail Address *(if known)* Johngeorgeromeo@ gmail. com

Pro Se 12 (Rev. 12/16) Complaint for Interpleader and Declaratory Relief

Defendant No. 1

Name — Neptune Ventures, LLC.
Job or Title *(if known)*
Street Address — 2451 W. Grapevine Mills Cir.
City and County — Grapevine TX
State and Zip Code — TX 76051
Telephone Number
E-mail Address *(if known)*

Defendant No. 2

Name — Gregory B Fell
Job or Title *(if known)* — Attorney Representing
Street Address — 3021 E. Renner Rd.
City and County — Richardson, Texas 75082
State and Zip Code — Texas 75082
Telephone Number — 972 488-8177
E-mail Address *(if known)* — gfell@fellawfirm.com

Defendant No. 3

Name — Ray Washburne
Job or Title *(if known)* — TRUSTEE on DEED entered MAY 15, 2003
Street Address
City and County — Highland Park DALLAS
State and Zip Code — Texas
Telephone Number
E-mail Address *(if known)*

Defendant No. 4

Name — John F. WARREN
Job or Title *(if known)* — Court Clerk Probate No 2, County Clerk
Street Address
City and County — Dallas Dallas
State and Zip Code — Texas 75201
Telephone Number
E-mail Address *(if known)*

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction    AmenDmenT "

Defendant No. 5

| Name | W Kenneth Paxton |
|---|---|
| Job or Title *(if known)* | Office of Attorney General |
| Street Address | PO BOX 12548 |
| City and County | Austin  TRAVIS |
| State and Zip Code | Texas  78711-2548 |
| Telephone Number | (800) 252-8011 ; (512) 475-4413 |
| E-mail Address *(if known)* | |

Defendant No. 6

| Name | Edward Lopez, Elizabeth Weller |
|---|---|
| Job or Title *(if known)* | Attorney/Linebarger Goggan Blair ; Sampson LLP |
| Street Address | 2777 W, Stemmons Fwy Ste 1000 |
| City and County | Dallas  Tx |
| State and Zip Code | Dallas  75207-2328 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 7

| Name | Ray Lee Hunt |
|---|---|
| Job or Title *(if known)* | unauthorized TRUSTEE |
| Street Address | 1900 North AKARD STREET DALLAS TX . |
| City and County | Dallas  Dallas |
| State and Zip Code | Texas  75201 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| Name | Charlie B Mitchell Jr. |
|---|---|
| Job or Title *(if known)* Attorney | Assigned Counsel to Kenneth R, Stewart ; Marco Montenegro |
| Street Address | 1995 Forrest LANE |
| City and County | GARLAND  Dallas |
| State and Zip Code | Texas 75042 |
| Telephone Number | 214 736-9433 |
| E-mail Address *(if known)* | |

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question      ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

3729 False Claims Acts, Perjury Not allowed in court Proceedings
RICO ACT 1970 RACTEERING, 1983 and 1985 civil Rights Act

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship  14th Amendment violation.

1.    The Plaintiff(s)

a.    If the plaintiff is an individual

The plaintiff, *(name)* _____, is a citizen of the State of *(name)* _____.

b.    If the plaintiff is a corporation

The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____,

and has its principal place of business in the State of *(name)*

_____.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual

The defendant, *(name)* _____, is a citizen of the State of *(name)* _____. Or is a citizen of *(foreign nation)* _____.

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

the State of *(name)* _____ . Or is a citizen of

*(foreign nation)* _____ .

b.    If the defendant is a corporation

The defendant, *(name)* _____ , is incorporated under

the laws of the State of *(name)* _____ , and has its

principal place of business in the State of *(name)* _____ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than \$75,000, not counting interest and costs of court, because *(explain)*:

_____

III.    **Statement of Claim**

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the injunction or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur? At 2805 Cornell Cir. Irving TX 75062 on August 10.2020 Agent and defendant described property as a purchase and closing details of owning property, Dallas County Appraisal District Showing the same information that is not consistant with the filings entered at Dallas County Clerks office, as the Exhibits Attached as the fraudulent Concealment of ASSETS are being STOLEN, CONVEYED, TRANSFERED. MANAGED by Defendents in the 1ST Amended Defendant List, This MADE THE Ch ll.

B.    What date and approximate time did the events giving rise to your claim(s) occur? CASES harder to compel 6:30 pm on August 10,2020 by Agent John Romeo "KRS" interest and MADE plaintiff work 2x HARDER at the resolution

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

C.    What are the facts underlying your claim(s)?    *(For example: What happened to you? Who did what?*
      *Was anyone else involved? Who else saw what happened?)* During my investigation into Kenneth R.
STEWART'S ESTATE, Charlie & Mitchell Jr email the DEED OF TRUSTS regarding Assignment
of leases security Agreement, Fixture Fillings, and prior to the TFU and/or BANKRIPTCY ch. 11
Filing he resigned and would not give any more information regarding "KRS" Businesses and
interest. [2014] On or ABOUT Feburary 28 2018 Kenneth Stewart had me file a document in
probate Court No. 2 That is when we found out he was and is the Beneficiary of the
"HHTE" LARGEST TRUST created by HL Hunt Jr. The TRUSTS has been wrongfully Adjudicated
by the criminal acts which qualify for the ~~use~~ of The RICO ACT 1970 ~~by~~ Ray Hunt,
Ray WASHBURNE, John WARREN and Others.    TRIGGERING

## IV.    Irreparable Injury

Explain why monetary damages at a later time would not adequately compensate you for the injuries you
sustained, are sustaining, or will sustain as a result of the events described above, or why such compensation
could not be measured. The injuries that my family have endured are grand to the normal
one would sustain in similar or regular filing of complaints. The Defendents are
holdings office in High Places and begon the attack again and will no recourse
if the injunction is not granted the lose of home, and the title to possession
and Due Process which the Assignment of yeases is in amount of 3 million Dollars
has 42 houses in the assignment. which will be a great start to begin the reclamation
and reorganization of the mortgages in Texas and Abroads if not granted I
will lose what is most important and that is my family. Due to inability
To Support them.

## V.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal
arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include
the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any
punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or
punitive money damages.

To stop the eviction and terminate the writ ordered by CC
AT LAW No. 5. To prohibit any Agency from initiating or continuing
acts that cause the DUE Process of plaintiff to be VIOLATED.
Order the court Registery of CC at LAW #1 To Release funds Held
from previous court case which plaintiff is entitled to

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

C.     What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

I entered into a lease agreement under the false statements made by Real Estate agent John Romeo on August 10, 2020. On August 14, 2020 recieved a call from Nina Chudasarma stating she was the New owner and closing would be final on August 15, 2020. Adelma McMahan was also present and under the same Impression that property was being purchased by individual. I specifically asked The Agent if he had any knowledge of Kenneth R. Stewart and if the property had any other owner interest. The facts that Kenneth R. Stewart is Beneficiary to the Deed that the Assignment of Leases and is the Lender to the INDEPENDENT BANK AS owner grantor originally filed. Plaintiff Holds a

IV.     **Irreparable Injury** 23% interest in the deed of Trust entered on MAY 15, 2003

Explain why monetary damages at a later time would not adequately compensate you for the injuries you sustained, are sustaining, or will sustain as a result of the events described above, or why such compensation could not be measured.

I have made improvements to the property's landscape and the interior flooring and bathrooms and continued to manage the assets for the benefit of the beneficiary. After motioning the Appellant court to order a stay due To existing appeal, motion denied and the case was dismissed. Now the interference with my writ of Certiorir to the Supreme Court. and if this matter is continuing I may lose to opportunity to survive and with my complaint initiated here in the District Court of Northern TX. To find housing for my family without any funds, or any other way to present this case/complaint in a court of proper jurisdiction. Leaving Defendants without recourse of justice and That will Not be in the public's interest, loss of claim

V.     **Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

IN amount of 1.2 Billion - $250 million @ 23% : writ of Certiorin by Bill

A judgement was brought against myself and Adelma McMahan in a Civil Suit filed by Neptune Ventures in amount of $15,000 plus attorney fees, which the interference and duress from the case made my brief and record excerpts late and caused my Appeal 2010340 in the Fifth Circuit To be dismissed. The amount I had been seeking was $17,000,000,000.00 To prevent any interference by other parties or To bar any New Suit against plaintiff including writ of NON attachment.

Page 5 of 7

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    9/22/2021

Signature of Plaintiff    Marco A Montenego

Printed Name of Plaintiff    Marco A Montehuyo

### B.    For Attorneys

Date of signing:    9-28-2021

Signature of Attorney

Printed Name of Attorney    Marco A Montenego

Bar Number    NA

Name of Law Firm

Street Address    2805 Cornell Cir.

State and Zip Code    Texas    75062

Telephone Number    469 735 6306

3-21-CV 2252-N

UNITED STATES DISTRICT Court

CLERK US DISTRICT COURT
NORTHERN DIST OF TX
FILED
2021 SEP 23  PM 3:53

DEPUTY CLERK___MS

for the

NORTHERN DISTRICT of Texas

Dallas Division

Marco L Montemayor
    Plaintiff

    ~ v -

Neptune Ventures, LLC.

Emergency Order for "Temporary"
Restraining Order

comes Now,

Petitioner / Plaintiff Marco A Montemayor
Under Rule 10.2 (c) requesting Temporary Restraining
order from the eviction Filed by Defendants. Plaintiff
enters evidence to support the granting of such
order see attached Exhibits A- . The Plaintiff
request to enjoin Defendants from executing a 24 hr.
order to vacate pause on removal of property and persons
who reside at subject property. Persuant to Rule 680-Temporary
Restraining order

"Cont"  ①

After Reviewing Texas Emergancy Applacation, court finds that Texas Requirements For granting order of Emorgancy TRO are satisfied. Attached "Exhibit A" plaintiffs complaint af fraud by defendants as stated in Application for injunction which the standard for issuing TRO are the same "injunction relief". see Clark v. Prichard, 812 F.2d, 991, 993 (5th Cir, 1987) Injunction Relief is "an Extraodinary remedy" that may be awarded only upon "showing a clear entitled right to such relief." Winter v. Nat. Res. Def, council, Inc, 555 U.S. 7, 22, 129 S.Ct 365, 376, 172 L.Fd. 2d. 249(2008). "Such extraodinary relief would issue only where (1) there is substantial likellhood that mowant will prevail on the merits (2) there is substantial threat that irreparable harm will result if the injunction is not granted (3) the Threatened injury outweighs the threatened harm to the defendants; and (4) the granting of the prelimary injunction will not deserve the public interest " Clark, 812 F.2d at 993. "The party Seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted"

②

## Application

In its Emergency Application, Plaintiffs argues it will likely succeed on the merits of its challenges to the Defendents claim is the Lease Agreement and judgement for Breach of Contract. There Is No significant risk it would suffer imminent and irreparable harm if a TRO is (NOT) granted, and a TRO would Not harm defendents or the public. The Court Agrees.

Temporary Restraining Order is meant only to "Preserve, for a very brief time, the status quo, so as to avoid irreparable Damage or Injury pending a hearing on the Issuance of of a preliminary injuction and motion to set aside judgement see Hearing dated Oct. 1 2021 at CC at haw No. 5 Dallas County. Norman Bridge Drug Co v. Banner, 529 F. 2d. 822, 829 (5th Cir. 1976). Importantly, "[I]F the currently existing status quo itself is causing the currently existing status quo itself is causing one of the parties irreparable injury, it is Necessary to alter the situation so as to prevent the injury....by [inter Alia] returning to the Last uncontested status quo between the parties. 'Canal Auth. of state of Florida v. Callaway, 489 F. 2d. 567, 576 (5th Cir. 1974) (emphasis, ellipsis, and alteration added)(citation omited): See also United States v. FDIC, 881 F.2d. 207. 210 (5th Cir. 1989) ("[T]he district court finds has the equitable power to return the parties to their uncontested status") The Court here finds that the "Last uncontested status quo" here is the Appeal to 5th Court of Appeals Dallas County Texas.

cont
(3)

Conclusion

For the foregoing reasons, the court Grants Petitioner/ Plaintiff Emergency Application For Temporary Restraining Order.

Therefore, it is hereby Ordered that:

Defendants and all their respective agents, officers, Servants, employees, attorneys and other persons who are in active concert or participation with them are hereby Enjoined and Restrained from enforcing the 24 hr. eviction and removal of property and persons, Property Address 2805 Cornell Cir. Irving, Tx 75062.

This TRO is granted only for the subject property address above and prohibits enforcement of Eviction and For the 30 day time period or after the Hearing For preliminary injunction, Hearing to set aside judgement set For October 1, 2021.

Finally, the Court Orders the Parties to propose

Cont. (4)

a briefing schedule No later than the first Tuesday of October 2021 with respect Marco Montemayors Pleminary Injunction IlF Its/HH's Complaint, Party must discuss expidited dis Covery is neressary and contours and schedulry for same.

The court will promptly schedule a hearing on the motion for prelimnary IFAS requested and neckessary.

It is So Ordered

Signed the September 23, 2021

United States District
Judge

TABLE OF
Exhibits

BIE OF EXHIBITS

' HL. Hunt JR

A) IRS   Private Letter Ruling  Page 1
Irrevocable Trust created December 28 1935
Article III, NOT To Dissolve Terminate, SHAll
Remain in tact Not to Dissolve, No action in the
Courts of law and Equity against the estate
WestLaw PLR 9425014, 1994 WL 278667 (IRS PLR)

B) Vinson & EIKINS  Memorandum   May 20 2003
Eric Viehman  JAMES Mayer  Lisa Kaufman
RE Margaret Hunt Hill Estate Trust
Ref. Article III - Sec Footnote -
· PUC Hearing regarding TXU, Oncor

C) Recusal motion No· 3:07-cr-02020-L
Document 1658 At HILL III Frivolous filing.
5th Circuit Jurisdiction - Ref Article III
Tolliver Harris No recusal of Plaintiff action
Brought on December 4, 2017. Sec. 3:17 cv 3296

D) Fifth Circuit Court of Appeals
No-18-11633 - H.L. Hunt DIED 1974,

E) TXU Corp. Discription of Parties and
Oncor operates 115,000 miles of Transmission Lines. "In the Name of Kenneth R.
Stewart, Ref 14-10979 EFH Bankruptcy
Fidicuary Breach Concealment.
Creation of TEF, GP Texas Energy Future Capital
Holdings LLC, · Notes Pursuant Merger Agreement
No consent by Holder Kenneth R. Stewart.
P. 1-5 Details of merger and concealment.

F) Form D  Notice of Sale of Securities
Goldman Sachs TXU Investors, LP
Private Investment Fund, ·
·P. 1-9 - only For ref Packet Incomplete

" Cont "

G) Haynes Boone
    Objection to Disclose of
    Confidential Information
    • Ref ("HLHJrTE") as to be HHTE

    • William A. Brewer III Esq.
        Bickel + Brewer

    • George W. Bramlett Jr.
        Haynes Boone
    Patrick Shaw
    William B. Chawey

1 • Privacy Rights.  Godwin Pappas Ronguillo
    Bruce Bowman JR       LLP.
    (1)
2 • Temporary order Sealing Exhibits
    N. and P.
    (1)
3 - Notice of Hearing on
    Respondent's motion to permanently seal
    Exhibits N. and P.
    (1-3)

H) Death Certificate of H.L Hunt Jr.
    Dates Not Consistant with Original
    Death in 1974. Filed in Dallas County
    For the Sole Purpose to Probate
    Will or Construct. such.

I) ANSWER of ALBERT G. Hill III
    TRUSTEE motion For Division of TRUST
    Reference the trust as ("HLHJrTE") the
    trust is ("HHTE"). Article III 1,R,S.
    1- AFFIDAVIT of SERVICE
    2- Certificate of Service

'' Cont "

J) Charles B. Mitchell Fee Invoice
Detailing the Deed of Trust, Assignment of
Leases as he Sends to Kenneth R Stewart Jr.
(client), Marco A. Montemayor as Authorized
Agent to collect Assets for Kenneth R.
Stewart Jr. and information of such.

K) Notice of Hearing
Probate No. PR-08-00830-2

AFFIDAVIT OF THE BENEFICIARY,
HEIRSHIP INJUNCTION ON THE
SALE OF THE ESTATE OF H. L. HUNT

• ONLY TWO PARTIES, Kenneth R.
STEWART Beneficiary and
Carrie Huff.

L) TXI OPERATING TRUST
TXI OPERATIONS LP.
CHESAPEAKE LAND CO. LLC.

I - TXI AVIATION 1 LLC,
MEMORANDUM OF LEASE
Love Field AIRPORT,
TEXAS INDUSTRIES

M) Affidavit of Ownership
23% of Estate Belonging to
Kenneth R. STEWART JR



Page 2 of 7

Westlaw.

PLR 9425014, 1994 WL 278667 (IRS PLR)                                                    Page 1

**C**
PLR 9425014, 1994 WL 278667 (IRS PLR)

Internal Revenue Service (I.R.S.)
Private Letter Ruling

Issue: June 24, 1994
March 23, 1994

Section 2041 -- Powers of Appointment (Included
v. Not Included in Gross Estate)2041.00-00
Powers of Appointment (Included v. Not Included
in Gross Estate)
2041.01-00 Pre-1942 Powers
Section 2514 -- Powers of Appointment (Transfer v.
Not a Transfer)2514.00-00 Powers of Appointment
(Transfer v. Not a Transfer)
Section 2518 -- Disclaimers2518.00-00 Disclaimers
Section 2601 -- Tax on Generation Skipping
Transfers2601.00-00 Tax on Generation Skipping
Transfers
CC:DOM:P&SI:4 / TR-31-2923-93
Re:

Legend:

The trust = ***

Father = ***

Mother = ***

Son = ***

Son's spouse = ***

Grandchild 1 = ***

Grandchild 2 = ***

Grandchild 3 = ***

Grandchild 4 = ***

Dear ***

This is in response to your November 16, 1993
letter in which you requested rulings concerning the
federal estate, gift, and generation-skipping transfer
tax treatment of powers of appointment created
under a trust agreement and consequences of a
proposed disclaimer.

Facts:

Father and Mother created the trust as an
irrevocable trust, on December 28, 1935. You
represent that there were no additions to the trust
after September 25, 1985.

Under Article IV, Section 4 of the trust, the trustee
has the discretion to make distributions to the
beneficiary of all or part of, but never more than,
the net profits of the trust. Under Article III, Section
1, no beneficiary can require distribution of trust
corpus or partition or termination of the trust.
Article IV, Section 3 provides that the trust will
terminate 21 years after Son's death, when the
trustee will distribute the trust corpus among the
then existing beneficiaries.

Article III provides:
Section 2: The death, insolvency or bankruptcy
of the Beneficiary hereunder, or the transfer of
his interest in any manner, or by descent or
otherwise, during the continuance of this Trust,
shall not operate as a dissolution of nor
terminate the Trust, nor shall it have any effect
whatever upon said Trust Estate, its operation
or mode of business, nor shall it entitle his heirs
or assigns or representatives to take any action
in the courts of law or equity against the Estate,
its Trustees or property or its business
operations of any kind, all of which shall
remain intact and undisturbed thereby; but they
shall succeed only to the rights of the original
Beneficiary as herein set forth.
Section 3: At the time of the death of the
Beneficiary, his equitable interest in said Trust
Estate, unless disposed of otherwise by said

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

20-10340.1367

Page 3 of 5

PLR 9051012, 1990 WL 701278 (IRS PLR)                                                    Page 2

any power not released or disclaimed will lapse at that heir's death. You represent that Z has never transferred any interest in the trust.

You request a ruling that Z has a general power of appointment under the terms of Trust that was created before October 21, 1942, and that the release or lapse of the power by Z will not be treated as the exercise of the power for federal estate and gift tax purposes. Similarly, the subsequent release or lapse of the power by any potential heir of Z will not be treated as an exercise of the power by that heir.

In addition, you request a ruling that proposed disclaimers by Z's potential heirs within nine months after the release by Z will be qualified disclaimers under section 2518 of the Code. Moreover, similar disclaimers by Z's heirs within nine months of Z's death will be qualified disclaimers of property interests in Trust that were not released by Z.

You also request a ruling that the proposed disclaimers will not create transfers that are subject to the generation-skipping transfer tax and that the release or lapse of the general power of appointment by Z or any of Z's potential heirs will not result in any part of Trust being subject to the generation-skipping transfer tax.

Section 2041(a) of the Internal Revenue Code includes in the value of the gross estate the value of any property with respect to which the decedent exercised a general power of appointment that was created before October 21, 1942. The failure by the decedent to exercise the power or the complete release of the power is not an exercise of the power.

Section 2041(b)(1) of the Code defines a general power of appointment as a power that is exercisable in favor of the decedent, the decedent's estate, the decedent's creditors, or creditors of the decedent's estate.

Section 20.2041-1(b) of the Estate Tax Regulations states that a power of appointment includes all powers that are in substance and effect powers of appointment regardless of the nomenclature used in creating the power.

Section 20.2041-1(e) of the regulations states that a

power of appointment created by an inter vivos instrument is considered created on the date the instrument takes effect. Such a power is not considered as created at some future date merely because it is not exercisable on the date the instrument takes effect or because the identity of its holders is not ascertainable until after the date the instrument takes effect.

Section 20.2041-2(a) of the regulations states that property subject to a general power of appointment created on or before October 21, 1942, is includible in the gross estate of the holder of the power under section 2041 only if he exercised the power under specified circumstances. The value of the property subject to the power is includible only if the power is exercised by the decedent either by will or by a disposition which is of such a nature that if it were a transfer of property owned by the decedent, the property would be includible in the decedent's estate under sections 2035, 2036, 2037, or 2038.

Section 20.2041-2(d) of the regulations states that a failure to exercise a general power of appointment created on or before October 21, 1942, or a complete release of such a power is not considered to be an exercise of a general power of appointment. The phrase "a complete release" means a release of all powers over all or a portion of the property subject to the power of appointment, as distinguished from the reduction of a power of appointment to a lesser power.

For federal gift tax purposes, section 2514(a) of the Code States that the exercise of a general power of appointment created on or before October 21, 1942, is a transfer of property by the individual possessing the power; but the failure to exercise the power or the complete release of the power is not an exercise of that power.

Section 25.2514-2(c) of the Gift Tax Regulations states that the release or lapse of a general power of appointment is not an exercise of the power and, thus, not a transfer of property by the individual possessing the power.

Section 2518(a) of the Code provides that if a person makes a qualified disclaimer of any interest in property, the interest is treated as if it had never been transferred to the disclaimant. Section 2518(b) defines a qualified disclaimer as an irrevocable and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

20-10340.1429

Page 4 of 5

PLR 9051012, 1990 WL 701278 (IRS PLR)

Page 3

unqualified refusal by a person to accept an interest in property but only if (1) the refusal is in writing and received within nine months after the transfer creating the interest, (2) the disclaimant has not accepted the interest or any of its benefits, and (3) as a result of the disclaimer, the interest passes without any direction on the part of the disclaimant to either someone other than the disclaimant or the decedent's spouse.

Section 25.2518-1(b) of the regulations states that if a qualified disclaimer is made, for federal estate, gift, and generation-skipping transfer tax purposes, the property is considered as passing directly from the transferor of the property to the person entitled to receive the property as a result of the disclaimer and the person making the qualified disclaimer is not treated as making a gift.

Section 25.2518-2(b)(3) of the regulations states that, in the case of a general power of appointment, the holder of the power has a nine month period after the creation of the power in which to make a disclaimer. If the interest in property passes by reason of an exercise or lapse of a general power, the disclaimer must be made within nine months after the exercise or lapse.

Section 25.2518-3(a)(2) of the regulations states that a disclaimer of an undivided portion of an interest in a trust may be a qualified disclaimer.

Section 25.2518-3(b) of the regulations states that a disclaimer of an undivided portion of a disclaimant's separate interest in property will be a qualified disclaimer if the undivided portion consists of a fraction or percentage of each and every substantial interest or right owned by the disclaimant in such property and extends over the entire term of the disclaimant's interest in such property. A disclaimer of some specific rights while retaining other rights with respect to an interest in the property is not a qualified disclaimer of an undivided portion of the disclaimant's interest in the property.

Section 2601 of the Code imposes a tax on every generation-skipping transfer.

Section 2611 of the Code defines the term " generation-skipping transfer" to mean (1) a taxable distribution, (2) a taxable termination, and (3) a

direct skip.

Section 26.2601-1(b)(1)(i) of the Temporary Generation-skipping Transfer Tax Regulations states that the generation-skipping transfer tax will not apply to any generation-skipping transfer under a trust that was irrevocable on September 25, 1985. However, the generation-skipping transfer tax will apply to a portion of the trust if any additions are made to the trust after September 25, 1985.

Generally, if any portion of a trust remains in the trust after the taxable exercise, release, or lapse of a general power of appointment over that portion of the trust, the value of the entire portion of the trust subject to the power that was exercised, released, or lapsed will be treated as an addition to the trust. See section 26.2601-1(b)(1)(v) of the regulations.

Based on the foregoing facts and law, we rule as follows.:

A. The Trust creates in Z (and the heirs who succeed to Z's interest in the Trust) a general power of appointment which for purposes of section 2041(a)(1) and section 2514(a) of the Code is a general power of appointment created on or before October 21, 1942.

B. There will be no transfer subject to federal gift tax if Z or an heir completely releases his or her power of appointment in whole or in part, and no part of the Trust will be includible in Z's gross estate or in an heir's gross estate for federal estate tax purposes as a result of Z or an heir allowing his or her power of appointment to lapse at death without being exercised, in whole or in part (as to the part not exercised).

C. The proposed disclaimers will be qualified disclaimers under section 2518 of the Code.

D. Under the transitional rules for the generation-skipping transfer tax imposed under section 2601 of the Code, the release or lapse (as opposed to the exercise) by Z or by any of the heirs of the power of appointment created under the Trust will not cause any part of the Trust to be subject to the generation-skipping transfer tax.

E. The proposed disclaimers will not create transfers subject to the generation-skipping transfer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

20-10340.1430

Page 5 of 5

PLR 9051012, 1990 WL 701278 (IRS PLR)

Page 4

tax imposed under section 2601 of the Code.

Except as we have specifically ruled herein, we express no opinion about the proposed transaction under the cited provisions of the Code or any other provisions of the Code.

This ruling is directed only to the taxpayer who requested it. Section 6110(j)(3) of the Code provides that it may not be used or cited as precedent. Temporary or final regulations pertaining to one or more of the issues addressed in this ruling have not been adopted. Therefore, this ruling will be modified or revoked by adoption of temporary or final regulations to the extent the regulations are inconsistent with any conclusions in the ruling. See section 8.04 of Rev. Proc. 90-1, 1990-1 I.R.B. 8. However, when the criteria in section 8.05 of Rev. Proc. 90-1 are satisfied, a ruling is not revoked or modified retroactively, except in rare or unusual circumstances.

Sincerely,
Assistant Chief Counsel
(Passthroughs and Special Industries)

Lee A. Dunn
Senior Technician Reviewer, Branch 4

Enclosure

Copy for 6110 purposes

This document may not be used or cited as precedent. Section 6110(j)(3) of the Internal Revenue Code.
PLR 9051012, 1990 WL 701278 (IRS PLR)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

20-10340.1431

Page 5
May 20, 2003

the transferor, not from the disclaimant, to the person entitled to receive the property as a result of the disclaimer. Thus, the disclaimant is not treated as having made a gift.[19]

☐ While the disclaimer must be delivered no later than the date which is 9 months after the date on which the transfer creating the interest in the disclaimant is made,[20] there is no limit on the earliest date on which a qualified disclaimer can be made. In the case of inter vivos transfers, the 9-month period begins when there is a completed gift for federal gift tax purposes, regardless of whether a gift tax is imposed on the completed gift. With respect to transfers that become irrevocable at death, the interest is considered to be created at death.[21] Thus, the holder of a general power of appointment may disclaim the power within 9 months after the creation of the power. A person to whom any interest in property passes due to the exercise or lapse of a general power may disclaim the interest within 9 months after the exercise or lapse.

☐ A disclaimer of an income interest in a trust, termination interest in a trust, or a power of appointment over a trust may be a qualified disclaimer.[22]

☐ A complete disclaimer of a general power of appointment over a trust created before October 21, 1942 will not be subject to federal gift or generation-skipping transfer tax, and no part of the trust will be includible in the disclaimant's estate for federal estate tax purposes.[23]

☐ Income interests and termination interests in the same trust are separate interests and may be disclaimed independently unless, under local law, the interests merge.[24] Thus, a beneficiary of an income interest and a termination interest in a trust may generally disclaim one interest while retaining the other interest.

☐ A disclaimer of an undivided portion of an interest in a trust may be a qualified disclaimer if the undivided portion consists of a fraction of each and every substantial interest or right owned by the disclaimant in the property and extends over the entire term of the disclaimant's interest in the property.[25]

☐ A disclaimer of an income interest in specific assets held in a trust while continuing to accept income from the remaining properties in the same trust is not a qualified

---

[19] IRC §2518(a) and Treas. Reg. §25.2518-1(b).
[20] Treas. Reg. §25.2518-2(c)(1).
[21] Treas. Reg. §25.2518-2(c)(3).
[22] Treas. Reg. §25.2518-3(a)(1)(i).
[23] See Priv. Ltr. Rul. 94-45-014 (November 10, 1994) wherein the Internal Revenue Service ruled specifically on this issue with respect to a trust having the same terms and creation date as the Trust Agreement. While IRC §6110(j)(3) provides that a private letter ruling cannot be relied on as precedent by taxpayers other than the taxpayer to whom the ruling is addressed, Priv. Ltr. Rul. 94-45-014 is especially relevant in that the IRS addressed issues that are in many respects the same issues addressed herein.
[24] Treas. Reg. §25.2518-3(d), Exs. (8) and (11).
[25] Treas. Reg. §25.2518-3(b).

Page 6
May 20, 2003

disclaimer unless the disclaimer results in such property being removed from the trust and passing, without direction on the part of the disclaimant, to persons other than the disclaimant. Moreover, a disclaimer of both an income interest and a termination interest in specific trust assets while retaining interests in other trust assets is not a qualified disclaimer unless the disclaimer results in such property being removed from the trust and passing, without direction on the part of the disclaimant, to persons other than the disclaimant.[26]

❑ The disclaimer of an interest or power while retaining a power to direct the disposition of that property will not be a qualified disclaimer.[27] Thus, a disclaimer of a termination interest by a beneficiary of a trust who also has a general power of appointment would not be a qualified disclaimer.[28] However, a disclaimer of an lifetime income interest by a beneficiary of a trust whose only other interest is a testamentary nongeneral power of appointment may be a qualified disclaimer.[29]

## APPLICATION OF LAW TO DISCLAIMER ISSUES:

- Transfer Tax Consequences to Disclaimers.

  ❑ A qualified disclaimer of a Child's GPOA, in whole or in part, would not constitute a transfer subject to federal gift tax.

  ❑ The lapse of a Child's GPOA at his or her death (without being exercised), in whole or in part, would not cause the trust estate of the Trust to be includible in the Child's estate as to the part that lapses.

  ❑ The qualified disclaimer of a Child's beneficial interests in the Trust, in whole or in part, would not cause the trust estate of the Trust to be subject to generation-skipping transfer tax.

- Timing of Disclaimers.

  ❑ If MHH allows her GPOA over the Trust to lapse, each Child could disclaim his or her interests in the Trust until the date that is 9 months after MHH's death.

  ❑ If MHH disclaims any portion or all of her GPOA over the Trust, each Child will have interests in the Trust that are contingent only upon surviving MHH. Thus, each Child would need to disclaim his or her interests in the Trust no later than 9 months after the date of MHH's disclaimer.

---

[26] Treas. Reg. §25.2518-3(a)(2).
[27] Treas. Reg. §25.2518-2(e)(1).
[28] Treas. Reg. §§25.2518-2(e)(5) Ex. (5) and 25.2518-3(d), Exs. (9) and (10).
[29] Treas. Reg. §25.2518-3(d) Ex. (15).

Page 7
May 20, 2003

- ❑ Since there is no limit on the earliest date on which a qualified disclaimer may be made, a Child could execute a qualified disclaimer at any time before MHH's death or before any disclaimer by MHH of her GPOA. In that event, the Child's disclaimer would be effective immediately and the disclaimed interests would take effect in possession and pass at MHH's death as though the Child predeceased MHH.

- • Permissible Types of Disclaimers.

  - ❑ Disclaimer of Termination Interest May Be Made Without Disclaimer of Income Interest. A Child may disclaim the termination interest in whole or in part without also disclaiming the income interest.

  - ❑ Disclaimer of Income Interest May Be Made Without Disclaimer of Termination Interest. A Child may disclaim the income interest in whole or in part without also disclaiming the termination interest.

  - ❑ Disclaimer of GPOA Must Accompany Disclaimer of Income Interest or Termination Interest. Since (i) the disclaimer of an interest in a trust while retaining a power to direct the disposition of that interest will not be a qualified disclaimer, and (ii) each Child has a GPOA with respect to that Child's entire beneficial interest in the Trust (i.e. over both the income interest and the termination interest):

    - ✓ A Child's disclaimer of an undivided portion or all of the income interest in the Trust must be accompanied by a disclaimer of that portion (or all) of the GPOA with respect to the income interest in the Trust. Thus, if a Child disclaims some portion or all of his or her income interest in the Trust, the Child must disclaim the GPOA over an identical portion of his or her income interest.

    - ✓ A Child's disclaimer of an undivided portion or all of the termination interest in the Trust must be accompanied by a disclaimer of that portion (or all) of the GPOA with respect to the termination interest in the Trust. Thus, if a Child disclaims some portion or all of his or her termination interest in the Trust, the Child must also disclaim the GPOA over an identical portion of his or her termination interest.

  - ❑ Disclaimer of Specific Assets or Undivided Portions.

    - ✓ If a Child disclaims his or her entire income interest in specific assets of the Trust while retaining the income interest in the remaining assets of the Trust, the disclaimer would have to result in the assets covered by the disclaimer being segregated in a separate trust from the undisclaimed assets, and the income interest in the disclaimed assets must pass, without direction on the part of the

Page 8
May 20, 2003

Child, to persons other than the Child.[30] The same rule would apply if the Child disclaims both the entire income interest and termination interest in specific assets of the Trust while retaining interests in other assets of the Trust.

✓ If a Child's disclaims an undivided portion of the income interest in the Trust, the Child would have to disclaim the GPOA over that portion of the income interest that is equal to the portion of the income interest disclaimed.

✓ If a Child's disclaims an undivided portion of the termination interest in the Trust, the Child would have to disclaim the GPOA over that portion of the termination interest that is equal to the portion of the termination interest disclaimed.

✓ If a Child's disclaims undivided but unequal portions of the income interest and the termination interest in the Trust, the Child would have to disclaim (i) the GPOA over that portion of the income interest that is equal to the income interest disclaimed, and (ii) the GPOA over that portion of the termination interest that is equal to the termination interest disclaimed.[31]

• Disposition of Disclaimed Interests.

  □ Since a disclaimed interest passes as though the disclaimant predeceased the transferor or decedent, a Child's disclaimed interests will pass at MHH's death to MHH's heirs as though the Child predeceased MHH. Since the beneficial interests pass to and vest in MHH's heirs at MHH's death, MHH's heirs would be determined as of MHH's death.

  □ Since a disclaimer affects only to whom a disclaimed interest descends and not the manner in which the interest is to be distributed, if all of the Children disclaim an undivided portion of their interests in the Trust, each disclaimer will be treated as if the disclaimant predeceased MHH vis-à-vis that Child's disclaimed interest. Thus, the distribution to MHH's heirs will be *per stirpes* and not *per capita*, that is – for a Child having descendants, those descendants will receive the same share the Child would have received in the absence of a disclaimer by that Child.

  ⊃ Based on the foregoing and on the provisions of the Trust Agreement, the disposition of the disclaimed interests would be as follows:

    ✓ If a Child disclaims an undivided portion or all of his or her income interest and/or termination interest, the disclaimed interest(s) will pass to and vest in MHH's heirs as though the Child did not survive, that is – the disclaimed

---

[30] A trust construction suit and/or a private letter ruling would probably be required to confirm that this "separate trust" requirement is satisfied if a Child decides to make a disclaimer as to specific assets.
[31] Since the income interest and the termination interest in the Trust are severable (*see* Priv. Ltr. Rul. 94-45-014) and the Trust Agreement gives each beneficiary a GPOA over that beneficiary's entire interest in the Trust, the GPOA over the income interest and the GPOA over the termination interest would likewise be considered severable.

Page 9
May 20, 2003

interests would vest in the disclaiming Child's descendants at MHH's death, but if that Child has no descendants, the disclaimed interests would pass and vest in the remaining Children (or their descendants). No portion of a disclaimed interest would pass to the spouse of a married Child. By comparison, with respect to the Child's undisclaimed interests, the Child's spouse would receive one-third of such interests if the Child died before the Trust's termination (assuming the Child also left surviving descendants).

✓ During the term of the Trust, each of a disclaiming Child's children (assuming none of them died before MHH) would have an equal share of the income interest the Child disclaimed and, upon termination, the Child's children would each receive equal portions of the termination distribution the Child disclaimed. If one of the Child's children dies during the term of the Trust, all of his or her beneficial interests in the Trust would pass to his or her heirs unless he or she exercised the GPOA.

✓ If a Child disclaims an undivided portion or all of his or her termination interest (and associated GPOA) but retains the entire income interest, the disclaimed termination interests will pass to and vest in MHH's heirs as though the Child did not survive, that is -- the disclaiming Child's children (assuming none of them died before MHH) would receive equal portions of the Child's termination interest at MHH's death, but if that Child has no descendants, the disclaimed interests would pass and vest in the remaining Children (or their descendants). During the term of the Trust, the Child would retain the income interest and, upon termination, the Child's children would receive equal portions of the termination distribution corresponding to the disclaimed termination interest. If one of the Child's children dies during the term of the Trust, his or her termination interest would pass to his or her heirs unless he or she exercised the GPOA.

✓ If a Child disclaims an undivided portion or all of his or her income interest (and associated GPOA) but retains the termination interest, the disclaimed income interest will pass to and vest in MHH's heirs as though the Child did not survive, that is -- the disclaimed income interest would vest in the disclaiming Child's children at MHH's death, but if that Child has no descendants, the disclaimed interests would pass and vest in the remaining Children (or their descendants). During the term of the Trust, each of the disclaiming Child's children would have a proportionate share of the income interest the Child would have received and, upon termination, the Child would receive the termination distribution. If the Child dies during the term of the Trust, his or her termination interest would pass to his or her heirs unless he or she exercised the GPOA.

Page 11
May 20, 2003

✓ Under the Trust Agreement, however, the income interest of each of these beneficiaries in the Trust is discretionary, with distributions of the net profits being wholly in the discretion of the trustee (with the consent of the Advisory Board), determined separately for each beneficiary. In effect, MHH's death divides the Trust into a series of "sub-trusts" – one for each new income beneficiary.[33] An income beneficiary's sub-trust will start out with the percentage of the original Trust listed above, but subsequent distribution and investment decisions may (and almost certainly will) vary from sub-trust to sub-trust, changing their relative sizes over time. The income beneficiary of a sub-trust may or may not be the person having the termination interest in that sub-trust, and a single sub-trust may have multiple termination beneficiaries. For example, the termination beneficiaries of Al, Jr.'s sub-trust would be Al, Jr. as to one-third and his children as to two-thirds.[34]

During the Trust's term (after Lyda's assumed death):

✓ Lyda's sub-trust (attributable to her retained income interest in 33⅓% of the Trust) would be reallocated, with Alinda's children receiving an income interest in one-half of such sub-trust and Al, Jr. receiving the income interest as to the other one-half. Assuming the Trust distributed $12 million of net profits proportionately to the beneficiaries in a given year, the distributions would be as follows:

| | |
|---|---|
| Alinda | $2,000,000 |
| Michael | 1,000,000 |
| Wesley | 1,000,000 |
| Cody | 1,000,000 |
| Margretta | 1,000,000 |
| Al Jr. | 5,000,000 |
| Heather | 333,333 |
| Elisa | 333,333 |
| Al III | 333,333 |

✓ This division would create a series of new sub-trusts for the income beneficiaries replacing Lyda, but the termination beneficiaries of these new sub-trusts would be a combination of old and new. Since Lyda originally disclaimed 50% of her termination interest, one-half of the termination beneficiaries of the new sub-trusts would be MHH's heirs, as determined at MHH's death (taking into account the disclaimers made within nine months of her death) – i.e. Alinda's children as

---

[33] This sub-trust concept is not expressly discussed in the Trust Agreement, but it is the recommended way for the trustee to administer the Trust given the beneficial rights and interests created under the Trust Agreement.
[34] To avoid having Al, Jr. as a termination beneficiary of the sub-trusts created for his children, Al, Jr.'s assumed disclaimer (25% of his income interest and 75% of his termination interest) would have two components – (1) a full disclaimer of both the income and termination interests as to 25% of his one-third share and (2) a disclaimer of only two-thirds of the termination interest as to the other 75% of such share.

Page 10
May 20, 2003

- Example of Practical Effect of Disclaimer:

  □ Assumptions for Example:

    ✓ All three of MHH's children – Alinda, Lyda and AJ, Jr. – survive her.
    ✓ At MHH's death, Alinda's children and AJ, Jr.'s children are all still living.
    ✓ Alinda disclaims 50% of her income interest (and the accompanying GPOA) and also disclaims 100% of her termination interest (and the accompanying GPOA).
    ✓ Lyda retains her entire income interest and disclaims 50% of her termination interest (and the accompanying GPOA).
    ✓ AJ, Jr. disclaims 25% of his income interest (and the accompanying GPOA) and disclaims 75% of his termination interest (and the accompanying GPOA).
    ✓ All beneficiaries survive the term of the Trust except for Lyda, who does not exercise her GPOA.[12] Following Lyda's death, Alinda disclaims any interest in the Trust that would otherwise pass to her as a result Lyda's death, but AJ, Jr. does not disclaim anything.

  □ Effect at MHH's Death:

  During the Trust's term (before Lyda's assumed death):

    ✓ Alinda will have an income interest in 16⅔% (50% of one-third) of the Trust, and her children will divide an identical 16⅔% share equally. Lyda will have an income interest in 33⅓% of the Trust. AJ, Jr. will have an income interest in 25% (75% of one-third) of the Trust, and his children will divide the remaining 8⅓% share equally.

    ✓ Assuming the Trust distributed $12 million of net profits proportionately to the beneficiaries in a given year, the distributions would be as follows:

| | |
|---|---|
| Alinda | $2,000,000 |
| Michael | 500,000 |
| Wesley | 500,000 |
| Cody | 500,000 |
| Margretta | 500,000 |
| Lyda | 4,000,000 |
| AJ Jr. | 3,000,000 |
| Heather | 333,333 |
| Elisa | 333,333 |
| AJ III | 333,333 |

---

[12] Exercising the GPOA would cause Lyda's undisclaimed share of the Trust to be taxed as part of her estate, but allowing it to lapse prevents such taxation.

Page 12
May 20, 2003

to 50% of such one-half, Al, Jr. as to 12.5% of such one-half and Al, Jr.'s children as to 37.5% of such one-half. The termination beneficiaries as to the other one-half would be Lyda's heirs, as determined at Lyda's death (taking into account Alinda's disclaimer following such death) – i.e. Alinda's children as to 50% of such one-half and Al, Jr. as to the other 50% of such one-half. Thus, for each new sub-trust established as a result of Lyda's death, the termination beneficiaries would be Alinda's children (50%), Al, Jr. (31.25%) and Al, Jr.'s children (18.75%).

Upon termination of the Trust:

✓ Upon the Trust's termination twenty-one years after MHH's death, the then remaining assets in each sub-trust would be distributed proportionately to the termination beneficiaries of that sub-trust. As to the new sub-trusts established as a result of Lyda's death, these termination beneficiaries are the persons listed above in the designated percentages. As to the sub-trust originally created for Alinda (attributable to her retained 50% income interest in her one-third share), Alinda's children would receive the termination distribution in equal shares. Each of Alinda's children would also receive the entire termination distribution from his or her own original sub-trust. As to Al, Jr.'s original sub-trust (attributable to his retained 75% income interest in his one-third share), Al, Jr. would receive one-third of the termination distribution and his children would receive the other two-thirds, in equal shares. Each of Al's Jr.'s children would also receive the entire termination distribution from his or her sub-trust.

## COMPARATIVE DISCUSSION OF HASSIE'S TRUST:

MHH's brother, Haroldson L. Hunt, Jr. ("*Hassie*"), has a separate but identical trust known as the Haroldson L. Hunt, Jr. Trust Estate (the "*Haroldson Trust*"). Unlike MHH, Hassie is exercising the GPOA over the Haroldson Trust, appointing the lineal descendants of MHH, *per stirpes*, as the beneficiaries.[35] This exercise prevents the Haroldson Trust from being divided among his heirs at his death, but it dramatically changes the estate and generation-skipping transfer tax attributes of the Haroldson Trust.

* The Haroldson Trust will be subject to estate taxation at Hassie's death, though his Last Will directs that the resulting estate and inheritance taxes be paid from Hassie's other assets.[36]

* If Alinda or Al, Jr. disclaims any portion of the income interest in their respective one-third shares of the Haroldson Trust, this will result in a severe tax consequence in that the disclaimed interest will be subject to an immediate federal generation-skipping

---

[35] This exercise is made in Hassie's Last Will dated November 2, 1988.
[36] IRC §2041(a).

Page 13
May 20, 2003

transfer tax (payable nine months after Hassie's death out of the assets covered by such disclaimer).[37] This adverse tax result should be contrasted with the beneficial tax result that occurs when a disclaimer is made with respect to the MHH Trust. A disclaimer of an income or termination interest in the MHH Trust allows assets to be moved down a generation without being subject to the generation skipping transfer tax.

□ Any disclaimers made with respect to interests in the Haroldson Trust would need to be filed within nine months of the date of Hassie's death, notwithstanding that any potential will contest might not have been completed at that time. (The statute of limitations for contesting a will is generally two years from the date the will is admitted to probate). To account for a potential contest, a disclaimer could provide alternative choices, one applicable if the will ultimately governs and another one applicable if the Haroldson Trust passes to Hassie's intestate heirs.

□ The applicable generation-skipping transfer tax rate will equal the highest marginal estate tax rate in effect at Hassie's death. In 2003, the applicable tax rate is 49%, and it gradually decreases to 45% by 2007.[38]

□ Since the disclaimed assets will bear the generation-skipping transfer tax, the effective tax rate is actually lower than the nominal tax rates listed above, because the tax on a "direct skip" (the type of generation-skipping transfer that would be triggered by the disclaimer of an income interest) is computed on a tax exclusive basis. Thus, for example, the tax imposed in 2003 would actually equal 32.9% of the value as of Hassie's death of the assets covered by the disclaimer, not 49%.

• By comparison, disclaimers by Alinda and Al, Jr. of all or part of their respective termination interests in the Haroldson Trust will not result in an immediate generation-skipping transfer tax. Instead, this tax would be imposed (barring repeal of the generation-skipping transfer tax) upon the earlier of the disclaimant's death or the termination of the Haroldson Trust. The type of generation-skipping transfer then occurring would be a "taxable termination" so the resulting tax is computed on a tax inclusive basis.[39] Thus, the tax imposed if the disclaimant died in 2009 would equal 45% of the date of death value of the assets covered by the disclaimer. Of course, without a disclaimer, these same assets would be taxed under current law in the disclaimant's estate as a result of his or her GPOA.[40]

• If Lyda exercises her GPOA over her one-third income and termination interests in the Haroldson Trust, the value of such interests would be subject to estate taxation at Lyda's death, unless the GPOA were exercised in favor of a charitable beneficiary.

[37] Treas. Reg. §26.2601-1(b)(1)(v).
[38] IRC §§2641 and 2001.
[39] IRC §2612.
[40] Under the assumed facts, the resulting estate tax would be lower than 45% of such date of death value, even though the top marginal estate tax rate applicable in 2009 is also 45%, because of the availability of the credit for prior transfers. This credit only applies if the disclaimant dies within ten years of Hassie's death.

Page 14
May 20, 2003

* Given the way Hassie exercised his GPOA, MHH cannot become a beneficiary of the Haroldson Trust at Hassie's death. However, MHH would become the beneficiary of Lyda's share of the Haroldson Trust if (i) Lyda survives Hassie, (ii) Lyda dies before MHH but prior to the termination of the Haroldson Trust, and (iii) Lyda fails to exercise her GPOA.[41] In that case, MHH (or either of Tom Hunt or Ivan Irwin acting under the power of attorney dated January 15, 1999) could fully disclaim MHH's entire interest within nine months of Lyda's death, causing that interest to pass instead to Lyda's siblings (or their descendants).

715928_1.DOC

---

[41] Under current law Lyda's undisclaimed share of Hassie's Trust will be taxed in her estate whether or not she exercises her GPOA.



Vinson&Elkins

VINSON & ELKINS L.L.P.
2300 FIRST CITY TOWER
1001 FANNIN STREET
HOUSTON, TEXAS 77002-6760
TELEPHONE (713) 758-2222
FAX (713) 758-2346
www.velaw.com

Eric Viehman
Direct Dial 713-758-4348
Direct Fax 713-615-5532
eviehman@velaw.com

**PRIVILEGED &
CONFIDENTIAL**

## MEMORANDUM

May 20, 2003

FROM:  Eric Viehman, James Meyer and Lisa Kaufman

RE:  Margaret Hunt Hill Trust Estate - Disclaimer Analysis

### SUMMARY OF TRUST'S OPERATION:

The Margaret Hunt Hill Trust Estate (the "*Trust*") was created under the Articles of Agreement and Declaration of Trust (the "*Trust Agreement*") effective December 28, 1935 with H. L. Hunt and Lyda Hunt as trustors and H. L. Hunt as trustee. The Trust operates as follows:

* **During MHH's Life**. Margaret Hunt Hill ("*MHH*") currently has two interests in the Trust:

  ○ MHH may receive distributions of net profits (but not capital gains) of the Trust (as certified annually by the Trust's accountants) in the discretion of the trustee with the consent of the Advisory Board (hereinafter, the "*income interest*").[1]

  ○ MHH has a general power of appointment, exercisable during her life or at her death, with respect to her beneficial interest in the Trust (the "*GPOA*").[2] Since this GPOA was created before October 22, 1942, the assets of the Trust have a highly favored tax status under the Internal Revenue Code of 1986, as amended ("*IRC*").[3] The Trust's assets will not be taxed in MHH's estate and no estate, gift or generation-skipping transfer tax will be imposed if those assets are transferred to younger generation beneficiaries via qualified disclaimers made within nine months of MHH's death. This tax-favored status will continue as long as the Trust is in existence and (i) neither MHH nor any other beneficiary exercises his or her GPOA, whether by

---

[1] See Article III, Section 1 and Article IV, Section 4 of the Trust Agreement.
[2] It is assumed for purposes of this memorandum that MHH and each future beneficiary of the Trust will possess a "general power of appointment" with respect to his or her interest in the Trust under Article III, Sections 2 and 3 of the Trust Agreement which provides that at a beneficiary's death, the beneficiary's equitable interest in the Trust passes to and vests in his or her heirs "unless disposed of otherwise by said Beneficiary". See Priv. Ltr. Rul. 94-45-014 (November 10, 1994) which rules to that effect with respect to a trust having provisions identical to the Trust.
[3] IRC §§2041(a)(1) and 2514(a).

AUSTIN · BEIJING · DALLAS · HOUSTON · LONDON · MOSCOW · NEW YORK · SINGAPORE · WASHINGTON, D.C.

Page 2
May 20, 2003

will or inter vivos act, and (ii) no beneficiary constructively exercises the powers granted the trustee (for example, by asserting control over the Trust's administration).

- At MHH's Death. At MHH's death, her interest in the Trust will pass to her intestate heirs -- currently, her three children (the "*Children*") in equal shares -- unless MHH exercises her GPOA.[4] If MHH exercises her GPOA, the Trust assets will be subject to estate tax at her death, but if she allows the GPOA to lapse, these assets will not be taxed at her death.[5]

- Termination. Twenty-one years after the death of MHH, the Trust will terminate and the remaining assets of the Trust will be distributed to the then-existing beneficiaries of the Trust -- currently, the Children in equal shares (assuming no disclaimers).[6]

- Children's Interests. Thus, if all of the Children outlive MHH and decide not to disclaim their interests in the Trust, the Children will become the beneficiaries of the Trust at MHH's death and each will have the following rights as to one-third of the Trust:

  □ An income interest;

  □ An interest in the remaining assets of the Trust upon its termination (that is contingent on surviving for 21 years after MHH's death) (a "termination interest"); and

  □ A GPOA to the extent of such Child's entire beneficial interest in the Trust. Since each Child has an income interest and a termination interest that vests at MHH's death, each Child has a GPOA over his or her income interest and over his or her termination interest.[7] It follows that a Child can exercise the GPOA with respect to his or her income interest independently of the termination interest and vice versa. Article III, Section 3 and Article IV, Section 3 of the Trust Agreement are consistent with this interpretation.

- Death of Child. If one of the Children dies after MHH but before the termination of the Trust and does not exercise his or her GPOA, the Child's interests in the Trust will pass to and vest in his or her intestate heirs, determined at the time of the Child's death.[8] A Child's intestate heirs would be: (i) if the Child is married and has children, one-third to the spouse and two-thirds to the Child's children (for personal property), unless the spouse disclaimed, in which case all to the Child's children; (ii) if the Child is not

---

[4] See Article III, Section 3 of the Trust Agreement.
[5] IRC §2041(a)(1).
[6] See Article IV, Section III of the Trust Agreement.
[7] In Priv. Ltr. Rul. 90-51-012 (December 21, 1990), which was clarified by Priv. Ltr. Rul. 94-45-014 (November 10, 1994), the Internal Revenue Service ruled with respect to a trust having provisions identical to the Trust that a Child's GPOA is the power to designate who will be the beneficiaries of the Trust, i.e., who will receive the Child's beneficial interests in the Trust. Since each Child has an income interest and a termination interest, each Child has the power, exercisable during life or at death, to appoint the income interest and/or the termination interest.
[8] See Article III, Section 3 of the Trust Agreement.

Page 3
May 20, 2003

married but has children, all to the children, and (iii) if the Child is not married and has no children, all to the Child's siblings (or their descendants).[9]

*DISCLAIMER ISSUES:* The issues in connection with the Children disclaiming some portion or all of their beneficial interests in the Trust are as follows:

- What transfer tax consequences are there, if any, to the disclaimers?

- What is the appropriate timing for the disclaimers?

- What are the permissible types of disclaimers?

- What effect will disclaimers have on the disposition of the beneficial interests in the Trust?

- What is the practical effect of the disclaimers?

*APPLICABLE LAW:*

- Texas Law on Disclaimer of Trust Interests.

  □ The beneficiary of an inter vivos trust who has not accepted any benefits from the trust or exercised control over the trust may disclaim an interest in the trust in whole or in part.[10] Thus, it is important for the disclaiming beneficiary to avoid any appearance of exercising control over the Trust assets.

  □ Once made, a disclaimer of an interest is permanent and irrevocable for all time. It cannot be changed in any manner, though an additional disclaimer filed within the applicable nine month period could effectively increase the original disclaimer.[11]

  □ The disclaimer must be in writing and filed of record not later than the date that is nine months after (i) the date on which the transfer creating the interest in the beneficiary is made or, (ii) in the case of a future interest, on "the date of the event that causes the taker of the interest to be finally ascertained and the interest to be indefeasibly vested."[12] (Except for MHH, all beneficiaries of the Trust have future interests which cannot be finally ascertained until MHH's death.)

---

[9] Tex. Prob. Code Ann. § 38 (Vernon 2003).
[10] Tex. Prop. Code Ann. §112.010(c) (Vernon 1995 & Supp. 2003).
[11] *Id.* §112.010(d).
[12] *Id.* §112.010(c).

Page 4
May 20, 2003

☐ A disclaimer of an interest in an inter vivos trust is effective as of the date of the transfer of the interest involved, and the interest that is subject to the disclaimer passes as if the disclaimant predeceased the transferor. A future interest that would otherwise take effect in possession after the termination of an interest that is disclaimed takes effect as if the disclaimant had predeceased the transfer.[13]

☐ A disclaimer affects only to whom a disclaimed interest descends and not the manner in which the interest is to be distributed.[14] Thus, a disclaimer by a member of the surviving class of heirs of the closest degree will not operate to alter the manner of distribution. For example, if the decedent's heirs are one brother with several children and a niece who is the child of a deceased sister of the decedent, the brother may disclaim his inheritance and this will create the legal fiction that the brother predeceased the decedent so that his share will pass to his children. However, the brother will be considered to have survived the decedent for purposes determining whether the distribution of the shares will be *per stirpes* or *per capita*.[15] Thus, the decedent's nieces and nephews would not take *per capita* as they would if both the decedent's brother and sister had predeceased the decedent. Instead, the distribution of the shares will be *per stirpes* – the distribution would be divided into two equal shares, with the child of the deceased sister receiving one share and each of the children of the surviving brother receiving an equal portion of the other share.[16]

- Federal Tax Law on Disclaimers.

☐ A "qualified disclaimer" under federal tax law is an irrevocable and unqualified refusal by a person to accept an interest in property, including a power over the property,[17] which meets the following requirements: (i) the disclaimer must be in writing and received by the transferor of the interest, his legal representative, or the holder of legal title to the property within 9 months from the later of the date on which the transfer creating the interest is made or the date on which the person refusing the interest attains age 21; (ii) the disclaimant must not have accepted the interest or any of its benefits; and (iii) due to the disclaimer, the interest passes without any direction by the disclaimant and passes either to a person other than the disclaimant or the spouse of the decedent.[18] (For the Trust, the "transfer" starting the nine month disclaimer period is deemed to occur as of MIH's death.)

☐ If a qualified disclaimer of an interest in property is made, the estate, gift, and generation-skipping transfer tax provisions will apply to that interest as if it had never been transferred to the disclaimant and the property is treated as passing directly from

[13] *Id.* §112.010(d).
[14] *Welder v. Hitchcock* 617 S.W.2d 294, (Tex. Civ. App.—Corpus Christi 1981, writ ref. n.r.e.).
[15] *See* Tex. Prob. Code Ann. §43 (Vernon 2003), which determines whether the distribution is *per capita* and *per stirpes*.
[16] *Welder v. Hitchcock, supra.*
[17] IRC §2518(e)(2).
[18] IRC §2518(b).



entered a per curiam opinion and issued a mandate dismissing Hill III's appeal for lack of subject matter jurisdiction. *Hill v. Schilling*, No. 15-10407 (5th Cir. Oct. 2, 2015).

Finally, to the extent Hill III challenges the Magistrate Judge's adverse rulings and suggests that they show bias, judicial rulings may be "proper grounds for appeal, not for recusal." *Andrade*, 338 F.3d at 455. Hill III has not provided any evidence of "deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555.

For the foregoing reasons, the court finds that recusal is unwarranted under § 455(a) or (b)(1), and there is no basis for a stay. Accordingly, the court will deny the relief sought.

III.   **Conclusion**

Based on the foregoing, the court **denies** Defendants' Motion to Disqualify Magistrate Judge or Withdraw Referral (Doc. 144 in the 4599 Action), and **denies** Albert G. Hill, III's Emergency Motion to Stay Proceedings Before Magistrate Judge, to Direct Magistrate Judge to Cease Conduct Exceeding Scope of Authority and for Withdrawal of Referrals to Magistrate Judge (Doc. 1631 in the 2020 Action).

Further, having considered the Hills's Motion for Recusal under the well-established parameters of 28 U.S.C. § 455(a) and (b)(1), *see supra*, the court finds that the motion is patently frivolous and totally without merit. The Hills's renewed attempt to oust Magistrate Judge Toliver, based on her July 23, 2015 in-court statements, is not only without any basis in law or fact, but has also caused the court and the opposing parties to expend resources and time addressing a motion that does not even marginally assert a colorable claim for recusal. This case has consumed an inordinate amount of the court's scarce judicial resources. Notwithstanding the undersigned's prior directives, as well as the Fifth Circuit's admonitions, the Hills and their counsel continue to use motion practice

Memorandum Opinion and Order – Page 12

argues that the Magistrate Judge "entered an order directly related to matters pending before the Fifth Circuit Court of Appeals." Doc. 1631 at 2. Hill III is apparently referring to his appeal of the court's order entered April 2, 2015 (Doc. 1550), denying his Motion for Rehearing, Reconsideration or Amend[ment] on a Single Issue Contained in the Court's Order dated November 13, 2014 (Doc. 1534). *See* Doc. 1570, Notice of Appeal. The single issue presented in the appeal was the court's denial of Hill III's request that the sale proceeds earmarked in the court's registry for the interest of the MHTE-Albert G. Hill III Trust be distributed to the MHTE-Albert G. Hill III Trust, rather than remain in the court's registry expressly subject to CHD and CNBW's claims.[8] HHTE New Hunt Trusts' payment of funds to purchase the appraised assets has already occurred and is not an issue on appeal. The asset purchase and right to obtain good and clear title to the assets are different from the issue on appeal, namely, whether the court correctly ruled that the sale proceeds earmarked in the court's registrry for MHTE-Albert G. Hill Trust should remain in the registry pending resolution of Hill III's disputes with CHD and CNBW. In any event, on October 2, 2015, the Fifth Circuit

---

[8] The Final Judgment provided that certain illiquid ownership interests held by the MHTE would be appraised and sold to the HHTE. Doc. 999, ¶¶ 10-11. As part of that process, in 2010, the HHTE paid $57 million into the court's registry to pay for those illiquid assets, including the illiquid assets held by the MHTE-Albert G. Hill III Trust. *See* Doc. 1046 at 4-5. The MHTE-Albert G. Hill III Trust's portion is worth $4.43 million. The HHTE New Hunt Trusts purchased the appraised assets in accordance with the appraisal process set forth in the parties' Settlement Agreement and the court's Final Judgment. *See* Final J. at 23 (Doc. 999); Settlement Agreement at 17-18 (Doc. 879). In December 2012, the HHTE trustees petitioned the court to release the registry funds to pay for the illiquid assets. (Doc. 1333). CHD and CNBW objected to the disbursement of the MHTE-Albert G. Hill III Trust's portion of those assets since the Final Judgment required that the funds remain in the court's registry subject to the law firms' claims, until their fee dispute with the Hills was resolved. (Doc. 1336). In November 2014, the court agreed with CHD and CNBW and ordered that the MHTE-Albert G. Hill III Trust's portion of the illiquid assets be maintained in the court's registry subject to CHD and CNBW's claim. (Doc. 1534). Following the court's denial of Hill III's motion for reconsideration, Hill III appealed this ruling. The Fifth Circuit recently dismissed this appeal for lack of subject matter jurisdiction. *Hill v. Schilling*, No. 15-10407 (5th Cir. Oct. 2, 2015).

20-10340.1053



REVISED March 13, 2020

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 4, 2020

Lyle W. Cayce
Clerk

No. 18-11633

ALBERT G. HILL, III, individually, and as a Beneficiary of the Margaret
Hunt Trust Estate, derivatively on behalf of the Margaret Hunt Trust Estate,
individually, as a beneficiary of the Haroldson Lafayette Hunt, Jr. Trust
Estate, and derivatively on Behalf of the Haroldson,

     Plaintiff-Appellant

v.

HEATHER V. WASHBURNE; ELISA M. SUMMERS; MARGARET
KELIHER, as Independent Executor of the Estate of Albert G. Hill, Jr.,

     Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before OWEN, Chief Judge, and BARKSDALE and DUNCAN, Circuit Judges.
STUART KYLE DUNCAN, Circuit Judge:

Once again, we consider a dispute related to trusts formed by Haroldson
Lafayette ("H.L.") Hunt, the late Texas oil baron reputed to be one of the
world's richest men when he died in 1974. *See generally Hill v. Schilling*, 495
F. App'x 480, 482 (5th Cir. 2012) (describing formation of the trusts); *Hill v.
Hunt*, 2009 WL 5125085, at *1 (N.D. Tex. Dec. 29, 2009) (same). After
"protracted [and] complicated" litigation, *Hill v. Schilling*, 593 F. App'x 330,

Flood damage in Dallas was extensive. Bridges were washed away; more than 270 homes and at least 40 businesses were severely damaged; lawns, gardens, and cemeteries were inundated; and seven lives were lost. Flooding on Bachman Branch, one of the watersheds in north Dallas, caused damages estimated at $1,330,000.

This report describes the flood event of April 28, 1966, for the following watersheds in north Dallas: Joes Creek, Bachman Branch, Turtle Creek, Cottonwood Creek, and Floyd Branch. This flood event is described in terms of rainfall (magnitude, intensity, frequency, and distribution), peak discharge at selected points, flood profiles, inundated areas, comparison with previous floods, effects of channel changes on flood profiles, and property damage and loss of life due to the flood. The flood on the main stem of White Rock Creek is also described, but in less detail. Figure 1 shows the location of the watersheds, and plate 1 shows the flooded areas.

In August 1961 the U.S. Geological Survey, in cooperation with the city of Dallas, began a program of continuing investigations designed to evaluate the hydrologic factors affecting floods on several small streams in Dallas. Supporting data and computations are in the files of the U.S. Geological Survey, Water Resources Division, Room 647, Federal Building, 300 East 8th Street, Austin, Tex.

The height of a flood at any location is generally stated in terms of the stage, which is the elevation of the water surface above a selected datum plane. In this report, flood heights (stages) are expressed in feet above mean sea level.

The rate of flow of a stream is the volume of water that passes a particular point in a given period of time. Discharge rates are given in cubic feet per second. The peak discharge is the maximum instantaneous rate of flow for a given flood.

## ACKNOWLEDGMENTS

The aid of personnel from the city of Dallas who furnished data and assistance for this report is gratefully acknowledged. H. H. Stirman, Director of Public Works, Dallas, Tex., and his staff worked closely with the field engineers to aid in collecting the most accurate data. On the morning of April 28, 1966, Public Works crews were in the flood area and flagged highwater marks. These marks were very helpful in establishing elevations for the flood profiles.

## THE STUDY AREA

The study area comprises about 150 square miles in or near Dallas. Most of the study area is in the 136-square-mile drainage area of White Rock Creek, a tributary to the Trinity River. Because the storm



x.  Direct Testimony in Support of Stipulation of William E. Avera (TEF Ex.___)

y.  Direct Testimony in Support of Stipulation of Robert S. Shapard (Oncor Ex. __)

No other parties offered testimony or other evidence.

5.  All parties [except _____] waived cross-examination at the hearing.

## Notice

6.  Notice of the Transaction and the proceedings in this docket was provided by first class mail to: (1) all municipalities in Oncor's service area; (2) all entities listed in the Commission's transmission matrix in Docket No. 33550, *Commission Staff's Application to Set 2007 Wholesale Transmission Service Rates for the Electric Reliability Council of Texas*; (3) all electric cooperatives and municipally-owned utilities with dually certified areas with Oncor; (4) all REPs currently certificated by this Commission; and (5) all authorized representatives for parties in Docket No. 22350, *Application of TXU Electric Company for Approval of Unbundled Cost of Service Rate pursuant to PURA § 39.201 and Commission Substantive Rule 25.344*. Further notice of this docket was provided by publication of an approved notice in local newspapers of general circulation in Oncor's service territory once a week for two consecutive weeks in accordance with P.U.C. PROC. R. 22.55.

7.  Notice of the Stipulation was provided to all parties in this proceeding and in Docket No. 34040, *Commission Staff's Petition for Review of the Rates of TXU Electric Delivery Company*.

## Description of the Parties to the Transaction

8.  Oncor is a Delaware limited liability company and is a direct wholly-owned subsidiary of TXU Corp. Oncor is an electric distribution and transmission utility that delivers power pursuant to rates approved by municipalities in which it provides service that have retained original jurisdiction and by the Commission. Oncor operates more than 115,000 miles of

29

distribution and transmission lines within the Electric Reliability Council of Texas ("ERCOT") region of Texas. Oncor also provides limited open access wholesale transmission service under tariffs on file with the Federal Energy Regulatory Commission ("FERC") for certain transactions that are subject to the jurisdiction of the FERC under Sections 210, 211, and 212 of the Federal Power Act.

9.  TEF is a Delaware limited partnership formed for the purpose of effectuating the Transaction. TEF is not a public utility. TEF is controlled by its sole general partner, Texas Energy Future Capital Holdings LLC, and is owned by its sole general partner and its limited partners. Upon consummation of the Transaction, which became effective on October 10, 2007, TEF became the owner of all or substantially all of the outstanding common shares of TXU Corp.

10. Pursuant to the Merger Agreement governing the Transaction, Texas Energy Future Merger Sub Corp., a Texas corporation and wholly owned subsidiary of TEF, was merged with and into TXU Corp., with TXU Corp. ' continuing as the surviving corporation. Upon the closing of the Transaction, each outstanding share of common stock of TXU Corp. was converted into the right to receive $69.25 in cash, without interest and less any applicable withholding taxes. After the closing of the Transaction, TEF now owns all or substantially all of the outstanding shares of TXU Corp., and Oncor remains a direct or indirect wholly-owned subsidiary of TXU Corp.

11. Because this is a change in ownership of TXU Corp.'s stock, none of Oncor's assets, franchises, or certificates of convenience and necessity were transferred as a result of the Transaction.

12. No utility operations were combined or modified as a result of the Transaction.

**The Stipulation**

13. TEF and Oncor made numerous commitments in their direct and rebuttal testimonies. Those commitments are included as part of the Stipulation and are listed below:

    a. **Name Change Commitment.** On or before closing of the Transaction, the name of TXU Electric Delivery Company will be changed to Oncor Electric Delivery Company. Oncor's logo will be separate and distinct from the logos of the parent,

___

As a result of the closing of the Transaction on October 10, TXU Corp. is now named Energy Future Holdings Corp. ("EFH Corp."). Any current references to TXU Corp. in this Order are to EFH Corp.

___

30

___

TXU Corp., the retail electric provider, which will retain the TXU Energy name ("TXU Energy Retail"), and the power generation company, which we expect to rename with the Luminant Energy brand ("Luminant"). In fact, the name of TXU Electric Delivery Company was changed to Oncor Electric Delivery Company on April 24, 2007. TXU Corp. commits to maintaining a name and logo for Oncor that is separate and distinct from the names of TXU Corp.'s retail electric provider and wholesale generation companies.

    b. **Separate Board Commitment.** At closing and thereafter, Oncor will have a separate board of directors that will not include any members from the boards of directors of TXU Energy Retail or Luminant. This Finding of Fact is supplemented by Finding of Fact Nos. 14.j and 14.k.

    c. **Separate Headquarters Commitment.** Within a reasonable transition period after closing of the Transaction, not to exceed six months, Oncor's headquarters will be located in a separate building from the headquarters and operations of TXU Energy Retail and Luminant.

    d. **No Transaction Related Debt at Oncor Commitment.** Oncor will not incur, guaranty, or pledge assets in respect of any incremental new debt related to financing the Transaction at the closing or thereafter. Oncor's financial integrity will be protected from the separate operations of TXU Energy Retail and Luminant. This provision is supplemented by Finding of Fact No. 14.r.

    e. **Debt-to-Equity Ratio Commitment.** Oncor's debt will be limited so that its regulatory debt-to-equity ratio (as determined by the Commission) is at or below the assumed debt-to-equity ratio established from time to time by the Commission for ratemaking purposes, which is currently set at 60% debt to 40% equity. For ratemaking purposes, in its scheduled rate cases in 2007 and 2008, Oncor will support a cost of debt that does not exceed Oncor's actual cost of debt immediately prior to the announcement of the Transaction. This Finding of Fact is supplemented by Finding of Fact Nos. 14.n, 14.o and 14.p.

f.    **Capital Expenditure Commitment.** Following the closing of the Transaction, Oncor will continue to make capital expenditures consistent with the capital expenditures in Oncor's business plan. Total capital spending will depend in part on

31

economic and population growth in Texas, as well as permitting and siting outcomes. However, in any event, over the five years following the year in which closing of the Transaction occurs, Oncor will make capital expenditures in connection with its transmission and distribution business in an aggregate amount of more than $3.0 billion. This commitment has been replaced by the provisions of Finding of Fact No. 14.v.

g.    **DSM/Energy Efficiency Commitment.** Over the five years following the year in which closing occurs, subsidiaries of TXU Corp. will expend an aggregate of at least $200 million on DSM over the amount included by the Commission in Oncor's rates. This commitment will approximately double the level of spending on DSM currently included in Oncor's rates. Oncor will not seek to recover in rates any of the $200 million in incremental DSM expenditures. This provision is supplemented by Finding of Fact Nos. 14.s and 14.t.

h.    **Service and Safety Commitment.** Oncor will support the inclusion of negotiated commitments with appropriate stakeholders regarding reliability, customer service and employee safety in any final order regarding the Transaction issued pursuant to PURA § 14.101. Those negotiated commitments are reflected in Finding of Fact Nos. 14.x, 14.y, and 14.z.

i.    **Rate Case Commitment.** If, for any reason, the Commission has not initiated a general rate proceeding for Oncor or its predecessor prior to July 1, 2008, Oncor will not later than that date file a general rate case consistent with its currently effective settlement agreement with certain municipalities.

j.    **Continued Ownership Commitment.** TEF will hold a majority of its ownership interest in Oncor, in the current regulatory system, for a period of more than five years after the closing date of the Transaction.

k.    **Holding Company Commitment.** A new holding company, Oncor Electric Delivery Holdings, will be formed between TXU Corp. and Oncor.

l.    **Independent Board Commitment.** Each of Oncor Electric Delivery Holdings and Oncor will have a board of directors comprised of at least nine persons. A majority of the board members of each of Oncor Electric Delivery Holdings and Oncor will qualify as "independent" in all material respects in accordance with the rules and

32



regulations of the New York Stock Exchange ("NYSE") (which are set forth in Section 303A of the NYSE Listed Company Manual and in Exhibit FMG-2), from TXU Corp. and its subsidiaries (including TXU Energy Retail and Luminant), TPG, and KKR. Consistent with TEF's commitments, the directors of Oncor and Oncor Electric Delivery Holdings will also not include any members from

the boards of directors of TXU Energy Retail or Luminant. This provision is supplemented by Finding of Fact No. 14.j.

m. **Affiliate Asset Transfer Commitment.** Neither Oncor Electric Delivery Holdings nor Oncor will transfer any material assets or facilities to any affiliates (other than Oncor Electric Delivery Holdings, Oncor, and their subsidiaries, which are hereinafter referred to as the "Ring-Fenced Entities"), other than such transfer that is on an arm's length basis consistent with the Commission's affiliate standards applicable to Oncor, regardless of whether such affiliate standards would apply to the particular transaction.

n. **Arm's Length Relationship Commitment.** Each of the Ring-Fenced Entities will maintain an arm's length relationship with the TXU Group consistent with the Commission's affiliate standards applicable to Oncor. This provision is supplemented by Finding of Fact No. 14.u.

o. **Separate Books and Records Commitment.** Each of the Ring-Fenced Entities will maintain accurate and appropriate detailed books, financial records and accounts, including checking and other bank accounts, and custodial and other securities safekeeping accounts that are separate and distinct from those of any other entity.

p. **Oncor Board's Right to Determine Dividends Commitment.** The Oncor Board, comprised of a majority of independent directors, will have the sole right to determine dividends. This provision is supplemented by Finding of Fact Nos. 14.a and 14.j.

q. **Capital Expenditures Within Oncor Service Territory Commitment.** The $3 billion minimum commitment for Oncor capital expenditures over the five years following the Transaction will be spent within the traditional Oncor system, and that amount does not include any transmission projects to be constructed by Oncor as a result of the Commission's decision in its Docket No. 33672, *Commission Staff's Petition for Designation of Competitive Renewable Energy Zones*. This commitment is replaced by Finding of Fact Nos. 14.v and 14.w.

33

r. **No Transaction Costs to Oncor Commitment.** None of the fees and expenses nor any incremental borrowing costs of TXU Corp. or its subsidiaries related to the Transaction will be borne by Oncor's customers. This commitment is supplemented in Finding of Fact No. 14.r.

s. **Exclusion of Goodwill Commitment.** The calculations for the debt-to-equity ratio commitment will not include goodwill resulting from the Transaction. This commitment is supplemented by Finding of Fact No. 14.q.

t. **No Intercompany Debt Commitment.** Oncor will not enter into any inter-company debt transactions with TXU Corp. affiliates following consummation of the Transaction. This commitment is supplemented by Finding of Fact No. 14.d.

u. **No Shared Credit Facilities Commitment.** Oncor will not share any credit facility with any unregulated affiliate. This commitment is supplemented by Finding of Fact No. 14.e.

e.  No additional guarantees should be required to ensure that the service quality and customer relations are commensurate with the requirements of PURA. (Preliminary Order, Criterion No. 2, at 3). The Stipulation imposes specific system SAIDI and SAIFI Performance Standards, a Worst Performance Feeder Standard, Street Lighting Performance Standards, and a Customer Service metric that make additional guarantees unnecessary. (Stipulation, paragraphs I.(46), (47), and (48)).

48

f.  No additional guarantees or commitments are required to ensure that no cost-shifting, cross subsidies, or discriminatory behavior occurs among Oncor's affiliates. (Preliminary Order, Criterion No. 3, at 3). TEF witness Goltz described ring-fencing provisions to be implemented that, in conjunction with the Commission's Substantive Rules, provide adequate protection against cost-shifting, cross-subsidies, or discriminatory behavior among Oncor's affiliates. (TEF Ex. __, pp. 14-16; Stipulation, paragraphs I.13-15).

g.  The ring-fencing proposed by TEF and Oncor will separate and help protect Oncor from bankruptcy or financial distress of an unregulated affiliate. (Preliminary Order, Criterion No. 4, at 4). TEF's and Oncor's commitments to implement the proposed ring-fencing mechanisms in conjunction with their agreements in the Stipulation support this finding. (TEF Ex. __, pp. 8-15; Stipulation, paragraphs I.1-5, 11-16, 20-22, 26-30, 32, 34-37).

h.  Additional guarantees or commitments are not required to ensure that Oncor's debt ratings as a result of this Transaction have no negative effect on ratepayers. (Preliminary Order, Criterion No. 5, at 4). Commitments made by TEF and Oncor in the Stipulation ensure that Oncor's cost of debt shall not increase for five years as a result of the Transaction. (Stipulation, paragraphs I.5, 19, 36-38).

i.  Oncor will make annual reports to the Commission regarding its compliance with the Oncor commitments. (Preliminary Order, Criterion 6, at 4).

j.  Given the Stipulation, the commitments made by the Oncor and TEF are consistent with the public interest. (Preliminary Order, Criterion No. 7, at 4).

## II. Conclusions of Law

1.  Oncor is an electric utility as that term is defined in Section 31.002(6) of the Public Utility Regulatory Act, Title II, Texas Utilities Code ("PURA") and is a wholly owned subsidiary of TXU Corp.

2.  The Commission asserts jurisdiction over the parties and the subject matter of the Stipulation by virtue of § 14.101 of PURA.

3.  Notice has been given to all affected persons as required by P.U.C. Proc. R. 22.55.

49

Each person executing this Stipulation represents that he or she is authorized to sign this Stipulation on behalf of the party represented. Facsimile copies of signatures are valid for purposes of evidencing this Stipulation, and this Stipulation may be executed in multiple counterparts.

## VIII.

34040.   Oncor will provide notice of this Stipulation and this proceeding to all parties in Docket Nos. 34077 and

WHEREFORE, PREMISES CONSIDERED, the Signatories respectfully pray this Honorable Commission to enter an order as set forth in Exhibit A granting the relief requested in this Stipulation and to grant them such additional relief not inconsistent therewith to which they are entitled.

STIPULATED AND AGREED TO AS OF OCTOBER 24, 2007, AND RESPECTFULLY SUBMITTED:

16

By:   /s/ Michael J. Tomsu
**VINSON & ELKINS L.L.P.**

Michael J. Tomsu

Texas Bar No. 20125875

Michael D. Marin

Texas Bar No. 00791174

The Terrace 7

2801 Via Fortuna, Suite 100

Austin, TX 78746

Tel: (512) 542-8400

Fax: (512) 542-8612

John C. Wander

Texas Bar No. 00791877

Texas Bar No. 24049580

3700 Trammell Crow Center

2001 Ross Avenue

Case 3:17-cv-03296-G-BK Document 164-Filed 09/28/21/20 Page 52 of 90 PageID 212
Case 3:21-cv-02252-N-BH Document 164 Filed 09/28/21/20 Page 56 of 27 PageID 1236
ORDER
PAGE 10 OF 12

## §25.74. Report on Change in Control, Sale of Property, Purchase of Stock, or Loan.

(a)   Pursuant to Public Utility Regulatory Act (PURA) §39.262(i)-(m) and §39.915, an electric utility must report to and obtain approval of the commission before closing any transaction in which:

(1)   the electric utility will be merged or consolidated with another electric utility;

(2)   at least 50% of the stock of the electric utility will be transferred or sold; or

(3)   a controlling interest or operational control of the electric utility will be transferred.

(b)   Pursuant to PURA §14.101(a)(1), an electric utility shall not sell, acquire, or lease a plant as an operating unit or system in the State of Texas for a total consideration of more than $100,000 unless the electric utility reports such transaction to the commission at least one commission working day before the transaction closes. Pursuant to PURA §37.154, if the transaction involves the sale, assignment, or lease of a certificate of convenience and necessity (CCN) or a right obtained under a CCN, the electric utility must obtain commission approval of such CCN transfer.

(c)   An electric utility shall not purchase voting stock in another public utility doing business in the State of Texas unless the electric utility reports such purchase to the commission at least one commission working day before the transaction closes.

(d)   An electric utility shall not loan money, stocks, bonds, notes, or other evidence of indebtedness to any person who directly or indirectly owns or holds 5% or more of the

Cross Reference to Statutes: Public Utility Regulatory Act §§14.001, 14.002, 14.101, and 37.154; Texas House Bill 624 §1, 80th Legislature, Regular Session (2007) (effective June 15, 2007; to be codified at PURA §39.262(l)-(o)); and Texas House Bill 3693 §25, 80th Legislature, Regular Session (2007) (effective September 1, 2007; to be codified at PURA §39.915).

*Commission response*

The rule has been amended to refer to when a transaction closes, which is consistent with HB 624 and HB 3693.

All comments, including any not specifically referenced herein, were fully considered by the commission. In adopting amended §25.74, the commission makes other changes to clarify its intent and conform the rule to current law.

The amendment and repeal are adopted under the Public Utility Regulatory Act, Texas Utilities Code Annotated §14.002 (Vernon 2007) (PURA), which provides the Public Utility Commission with the authority to make and enforce rules reasonably required in the exercise of its powers and jurisdiction; and specifically PURA §14.001, which gives the commission the general power to regulate and supervise the business of each electric utility; PURA §14.201, which requires the commission to keep itself informed as to the manner and method in which each electric utility is managed and its affairs are conducted; PURA §14.101, which requires the commission to review certain transactions of electric utilities; PURA §37.154, which requires the commission to review the transfer of a certificate of convenience and necessity of an electric utility; and Texas House Bill 624 §1, 80th Legislature, Regular Session (2007) (effective June 15, 2007; to be codified at PURA §39.262(1)-(o)) and Texas House Bill 3693 §25, 80th Legislature, Regular Session (2007) (effective September 1, 2007; to be codified at PURA §39.915), which require an electric utility to report to and obtain approval of the commission before closing certain transactions.

commission proceeding in which the transaction is being considered, including whether the commission has authority to delay or prohibit the closing of the transaction.

EGSI recommended that the proposed rule be clarified to specifically exclude jurisdictional separation and certain Chapter 39-related transactions from the scope of the rule. TXU Cities disagreed with EGSI's proposal, stating that jurisdictional separation transactions could have a significant impact on consumers in Texas and should be subject to oversight. TIEC, on the other hand, replied that the rules do not implicate EGSI's jurisdictional separation issue and need not be specifically addressed in the rule.

## Commission response

The commission agrees that the rule should not apply to activities covered by PURA §14.101(d) and §39.452(e), and has amended the rule accordingly. PURA §14.101(d) lists activities that are excluded from PURA §14.101. In addition, PURA does not contemplate mandatory, pre-closing review by the commission of the reasonableness of the manner in which jurisdictional separation done pursuant to PURA §39.452(e) is accomplished.

LCRA asserted that §25.74(i) is unclear as to when a "transaction" actually occurs, arguing that the proposed rule could be interpreted to mean a point in time when a contract for sale is executed or a later point in time, when actual title is set to transfer.

## Commission response

The threshold for review specified by PURA §14.101(a)(1) is $100,000.

Oncor argued that the commission should not adopt any rule amendment that would apply retroactively to any transaction reported to the commission, stating that such an action would amount to "changing the rules in the middle of the game." TIEC disagreed and argued that the commission is well within its power to modify procedural requirements and apply them to pending transactions.

## Commission response

With one exception, PURA §39.262(l)-(o) apply to any transaction described by subsection (l) that had not closed before June 15, 2007, the effective date of HB 624. The exception, pursuant to subsection (n), is a transaction for which a definitive agreement was executed before April 1, 2007, if the electric utility or a person seeking to acquire or merge with the electric utility made a filing for review of the transaction under PURA §14.101 before May 1, 2007, and the resulting proceeding is not withdrawn. PURA §39.915 contains the same provisions, but is effective on September 1, 2007. Proposed subsection (i), now adopted subsection (f), has been changed to conform to these new PURA provisions. The commission has also deleted proposed subsection (g), which provided that a transaction like those addressed by PURA §39.262(l) shall not occur before the commission completes its review of the transaction as proposed, regardless of the amount of time that has transpired since the report of the transaction to the commission was made. Any issue concerning the closing of a transaction addressed by PURA §39.262(n) can be addressed in the pending

subject to PURA §37.154, PURA effectively requires commission review of the transaction before it closes. In contrast, for a transaction reported pursuant to adopted subsection (b) that is not also subject to PURA §37.154, PURA does not require commission review of the transaction before it closes. The commission concludes that adopted subsection (b) appropriately distinguishes between those transactions that should be reviewed by the commission before they close and those for which commission review before closing should not be categorically required.

Subsections (c) and (d) address transactions that are less likely to have substantial and prompt impacts on utilities' service in comparison to transactions addressed by subsection (a) or transactions addressed by subsection (b) and subject to PURA §37.154. As a result, adopted subsections (c) and (d) require that a utility report a transaction addressed by subsections (c) or (d) at least one commission working day before the transaction closes, instead of not later than six months prior to the earliest date that the transaction could occur as provided in the proposed amendment. In addition, the commission has added a 5% stock ownership materiality threshold to adopted subsection (d).

LCRA objected to proposed §25.74(a) requiring transactions involving "more than $100,000" be reported, stating that a more objective transaction dollar value allowing oversight over more significant transactions would be appropriate and would cause ratepayers to bear fewer costs. AEP agreed, noting that $100,000 is a relatively small amount in the electric business.



OMB Number 3235-0076
Expires          April 30, 2008
Estimated average burden
hours per response:        16.00

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM D

## NOTICE OF SALE OF SECURITIES PURSUANT TO REGULATION D, SECTION 4(6), AND/OR UNIFORM LIMITED OFFERING EXEMPTION



07085134

| SEC USE ONLY | |
|---|---|
| Prefix | Serial |
| DATE RECEIVED | |

Name of Offering (□ check if this is an amendment and name has changed, and indicate change.)
Goldman Sachs TXU Investors, L.P.: Limited Partnership Interests

Filing Under (Check box(es) that apply):  □ Rule 504     □ Rule 505     ☑ Rule 506     □ Section 4(6)     □ ULOE

Type of Filing:  ☑ New Filing  □ Amendment

RECEIVED
DEC 03 2007
WASH

## A. BASIC IDENTIFICATION DATA

1  Enter the information requested about the issuer

Name of Issuer  (□ check if this is an amendment and name has changed, and indicate change.)
Goldman Sachs TXU Investors, L.P.

Address of Executive Offices  (Number and Street, City, State Zip Code)
85 Broad Street, New York, New York 10004

Telephone Number (Including Area Code)
(212) 902-1000

Address of Principal Business Operations  (Number and Street, City, State and Zip Code)
(if different from Executive Offices)

Telephone Number (Including Area Code)

PROCESSED

Brief Description of Business
To operate as a private investment fund.

DEC 07 2007

THOMSON
FINANCIAL

Type of Business Organization
□ corporation
□ business trust
☑ limited partnership, already formed
□ limited partnership, to be formed
□ other (please specify)

Actual or Estimated Date of Incorporation or Organization

| Month | | Year | |
|---|---|---|---|
| 0 | 9 | 0 | 7 |

☑ Actual     □ Estimated

Jurisdiction of Incorporation or Organization
(Enter two-letter U.S. Postal Service abbreviation for State; CN for Canada; FN for other foreign jurisdiction.)

| D | E |
|---|---|

## GENERAL INSTRUCTIONS

Federal:

*Who Must File:* All issuers making an offering of securities in reliance on an exemption under Regulation D or Section 4(6), 17 CFR 230.501 et seq. or 15 U.S.C. 77d(6).

*When To File:* A notice must be filed no later than 15 days after the first sale of securities in the offering. A notice is deemed filed with the U.S. Securities and Exchange Commission (SEC) on the earlier of the date it is received by the SEC at the address given below or, if received at that address after the date on which it is due (on the date it was mailed by United States registered or certified mail to that address.

*Where to File:* U.S. Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549

*Copies Required:* Five (5) copies of this notice must be filed with the SEC, one of which must be manually signed. Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed signatures.

*Information Required:* A new filing must contain all information requested. Amendments need only report the name of the issuer and offering, any changes therein, the information requested in Part C, and any material changes from the information previously supplied in Parts A and B. Part E and the Appendix need not be filed with the SEC.

*Filing Fee:* There is no federal filing fee

State:

This notice shall be used to indicate reliance on the Uniform Limited Offering Exemption (ULOE) for sales of securities in those states that have adopted ULOE and that have adopted this form. Issuers relying on ULOE must file a separate notice with the Securities Administrator in each state where sales are to be, or have been made. If a state requires the payment of a fee as a precondition to the claim for the exemption, a fee in the proper amount shall accompany this form. This notice shall be filed in the appropriate states in accordance with state law. The Appendix to the notice constitutes a part of this notice and must be completed.

## ATTENTION

Failure to file notice in the appropriate states will not result in a loss of the federal exemption. Conversely, failure to file the appropriate federal notice will not result in a loss of an available state exemption unless such exemption is predicated on the filing of a federal notice.

Potential persons who are to respond to the collections of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC 1972 (2-97) 1 of 9

2.   Enter the information requested for the following:

* Each promoter of the issuer, if the issuer has been organized within the past five years;

* Each beneficial owner having the power to vote or dispose, or direct the vote or disposition of, 10% or more of a class of equity securities of the issuer;

* Each executive officer and director of corporate issuers and of corporate general and managing partners of partnership issuers; and

* Each general and managing partner of partnership issuers.

| Check Box(es) that Apply: | ☑ Promoter* | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ | General and/or Managing Partner |

*Issuer's Investment Manager

Full Name (Last name first, if individual)
**Goldman, Sachs & Co.**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**85 Broad Street, New York, NY 10004**

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☑ | General and/or Managing Partner |

Full Name (Last name first, if individual)
**GS TXU Advisors, L.L.C.**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**85 Broad Street, New York, NY 10004**

| Check Box(es) that Apply: | ☐ Promoter | ☑ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ | General and/or Managing Partner |

Full Name (Last name first, if individual)
**Liberty Harbor Master Fund I, L.P.**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**c/o Liberty Harbor I GP, LLC, One New York Plaza, New York, NY 10004**

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☑ Executive Officer* | ☐ Director | ☐ | General and/or Managing Partner |

* of the Issuer's General Partner

Full Name (Last name first, if individual)
**Lane, Eric**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**85 Broad Street, New York, NY 10004**

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☑ Executive Officer* | ☐ Director | ☐ | General and/or Managing Partner |

* of the Issuer's General Partner

Full Name (Last name first, if individual)
**Barbetta, Jennifer**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**85 Broad Street, New York, NY 10004**

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☑ Executive Officer* | ☐ Director | ☐ | General and/or Managing Partner |

* of the Issuer's General Partner

Full Name (Last name first, if individual)
**Enquist, Katherine**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**85 Broad Street, New York, NY 10004**

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☑ Executive Officer* | ☐ Director | ☐ | General and/or Managing Partner |

* of the Issuer's General Partner

Full Name (Last name first, if individual)
**Friedman, Richard**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**85 Broad Street, New York, NY 10004**

SEC 1972 (2-97)

**A. BASIC IDENTIFICATION DATA**

Enter the information for the following persons:

* Each promoter of the issuer, if the issuer has been organized within the past five years;
* Each beneficial owner having the power to vote or dispose, or direct the vote or disposition of, 10% or more of a class of equity securities of the issuer;
* Each executive officer and director of corporate issuers and of corporate general and managing partners of partnership issuers; and
* Each general and managing partner of partnership issuers

---

Check Box(es) that Apply: ☐ Promoter  ☐ Beneficial Owner  ☑ Executive Officer* ☐ Director  ☐ General and/or Managing Partner
\* of the Issuer's General Partner

Full Name (Last name first, if individual)
**Olson, Kristin**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**85 Broad Street, New York, NY 10004**

---

Check Box(es) that Apply: ☐ Promoter  ☐ Beneficial Owner  ☑ Executive Officer* ☐ Director  ☐ General and/or Managing Partner
\* of the Issuer's General Partner

Full Name (Last name first, if individual)
**Restieri, Larry**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**85 Broad Street, New York, NY 10004**

---

Check Box(es) that Apply: ☐ Promoter  ☐ Beneficial Owner  ☑ Executive Officer* ☐ Director  ☐ General and/or Managing Partner
\* of the Issuer's General Partner

Full Name (Last name first, if individual)
**Bowman, John**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**85 Broad Street, New York, NY 10004**

---

Check Box(es) that Apply: ☐ Promoter  ☐ Beneficial Owner  ☑ Executive Officer* ☐ Director  ☐ General and/or Managing Partner
\* of the Issuer's General Partner

Full Name (Last name first, if individual)
**Boucher, Ryan**

Business or Residence Address   (Number and Street, City, State, Zip Code)
**85 Broad Street, New York, NY 10004**

---

Check Box(es) that Apply: ☐ Promoter  ☐ Beneficial Owner  ☐ Executive Officer  ☐ Director  ☐ General and/or Managing Partner

Full Name (Last name first, if individual)

Business or Residence Address   (Number and Street, City, State, Zip Code)

---

Check Box(es) that Apply: ☐ Promoter  ☐ Beneficial Owner  ☐ Executive Officer  ☐ Director  ☐ General and/or Managing Partner

Full Name (Last name first, if individual)

Business or Residence Address   (Number and Street, City, State, Zip Code)

---

Check Box(es) that Apply: ☐ Promoter  ☐ Beneficial Owner  ☐ Executive Officer  ☐ Director  ☐ General and/or Managing Partner

Full Name (Last name first, if individual)

Business or Residence Address   (Number and Street, City, State, Zip Code)

SEC 1972 (2-97)

**D. INFORMATION ABOUT OFFERING**

1. Has the issuer sold, or does the issuer intend to sell, to non-accredited investors in this offering?....................

   Answer also in Appendix, Column 2, if filing under ULOE.

   □ No  ☑

2. What is the minimum investment that will be accepted from any individual?

   *The Issuer may accept subscriptions for lesser amounts in the sole discretion of the General Partner.     $  1,000,000*

3. Does the offering permit joint ownership of a single unit?.................................................

   Yes ☑    No □

4. Enter the information requested for each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for solicitation of purchasers in connection with sales of securities in the offering. If a person to be listed is an associated person or agent of a broker or dealer registered with the SEC and/or with a state or states, list the name of the broker or dealer. If more than five (5) persons to be listed are associated persons of such a broker or dealer, you may set forth the information for that broker or dealer only.

Full Name (Last name first, if individual)

**NONE**

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers
(Check "All States" or check individual States) ...................................................... □ All States

| [AL] | [AK] | [AZ] | [AR] | [CA] | [CO] | [CT] | [DE] | [DC] | [FL] | [GA] | [HI] | [ID] |
| [IL] | [IN] | [IA] | [KS] | [KY] | [LA] | [ME] | [MD] | [MA] | [MI] | [MN] | [MS] | [MO] |
| [MT] | [NE] | [NV] | [NH] | [NJ] | [NM] | [NY] | [NC] | [ND] | [OH] | [OK] | [OR] | [PA] |
| [RI] | [SC] | [SD] | [TN] | [TX] | [UT] | [VT] | [VA] | [WA] | [WV] | [WI] | [WY] | [PR] |

Full Name (Last name first, if individual)

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers
(Check "All States" or check individual States) ...................................................... □ All States

| [AL] | [AK] | [AZ] | [AR] | [CA] | [CO] | [CT] | [DE] | [DC] | [FL] | [GA] | [HI] | [ID] |
| [IL] | [IN] | [IA] | [KS] | [KY] | [LA] | [ME] | [MD] | [MA] | [MI] | [MN] | [MS] | [MO] |
| [MT] | [NE] | [NV] | [NH] | [NJ] | [NM] | [NY] | [NC] | [ND] | [OH] | [OK] | [OR] | [PA] |
| [RI] | [SC] | [SD] | [TN] | [TX] | [UT] | [VT] | [VA] | [WA] | [WV] | [WI] | [WY] | [PR] |

Full Name (Last name first, if individual)

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers
(Check "All States" or check individual States) ...................................................... □ All States

| [AL] | [AK] | [AZ] | [AR] | [CA] | [CO] | [CT] | [DE] | [DC] | [FL] | [GA] | [HI] | [ID] |
| [IL] | [IN] | [IA] | [KS] | [KY] | [LA] | [ME] | [MD] | [MA] | [MI] | [MN] | [MS] | [MO] |
| [MT] | [NE] | [NV] | [NH] | [NJ] | [NM] | [NY] | [NC] | [ND] | [OH] | [OK] | [OR] | [PA] |
| [RI] | [SC] | [SD] | [TN] | [TX] | [UT] | [VT] | [VA] | [WA] | [WV] | [WI] | [WY] | [PR] |

(Use blank sheet, or copy and use additional copies of this sheet, as necessary.)

SEC 1972 (2-97)

1. Enter the aggregate offering price of securities included in this offering and the total amount already sold. Enter "0" if answer is "none" or "zero." If the transaction is an exchange offering, check this box ☐ and indicate in the columns below the amounts of the securities offered for exchange and already exchanged.

| Type of Security | | Aggregate Offering Price | | Amount Already Sold |
|---|---|---|---|---|
| Debt | | | | |
| Equity | | $ 0 | $ | 0 |
| | | $ 0 | $ | 0 |
| ☐ Common    ☐ Preferred | | | | |
| Convertible Securities (including warrants) | | | | |
| Partnership Interests | | $ 0 | $ | 0 |
| Other (Specify) | | $ 108,635,000 | $ | 108,635,000 |
| | | $ 0 | $ | 0 |
| Total | | $ 108,635,000 | $ | 108,635,000 |

Answer also in Appendix, Column 3, if filing under ULOE

2. Enter the number of accredited and non-accredited investors who have purchased securities in this offering and the aggregate dollar amounts of their purchases. For offerings under Rule 504, indicate the number of persons who have purchased securities and the aggregate dollar amount of their purchases on the total lines. Enter "0" if answer is "none" or "zero."

| | Number Investors | | Aggregate Dollar Amount of Purchases |
|---|---|---|---|
| Accredited Investors | 36 | $ | 108,635,000 |
| Non-accredited investors | N/A | $ | N/A |
| Total (for filings under Rule 504 only) | N/A | $ | N/A |

Answer also in Appendix, Column 4, if filing under ULOE

3. If this filing is for an offering under Rule 504 or 505, enter the information requested for all securities sold by the issuer, to date, in offerings of the types indicated, in the twelve (12) months prior to the first sale of securities in this offering. Classify securities by type listed in Part C-Question 1.

| Type of offering | Type of Security | | Dollar Amount Sold |
|---|---|---|---|
| Rule 505 | N/A | $ | N/A |
| Regulation A | N/A | $ | N/A |
| Rule 504 | N/A | $ | N/A |
| Total | N/A | $ | N/A |

4.a Furnish a statement of all expenses in connection with the issuance and distribution of the securities in this offering. Exclude amounts relating solely to organization expenses of the issuer. The information may be given as subject to future contingencies. If the amount of an expenditure is not known, furnish an estimate and check the box to the left of the estimate.

| | | | |
|---|---|---|---|
| Transfer Agent's Fees | | | |
| Printing and Engraving Costs | ☐ | $ | 0 |
| Legal Fees | ☐ | $ | 0 |
| Accounting Fees | ☑ | $ | 80,000 |
| Engineering Fees | ☐ | $ | 0 |
| Sales Commissions (specify finders' fees separately) | ☐ | $ | 0 |
| Other Expenses (identify) _____ | ☐ | $ | 0 |
| Total | ☐ | $ | 0 |
| | ☑ | $ | 80,000 |

SEC 1972 (2-97)

MBER OF INVESTORS, EXPENSES AN... SE OF PROCEEDS

b. Enter the difference between the aggregate offering price given in response to Part C - Question 1 and total expenses furnished in response to Part C - Question 4.a. This difference is the "adjusted gross proceeds to the issuer."

5. Indicate below the amount of the adjusted gross proceeds to the issuer used or proposed to be used for each of the purposes shown. If the amount for any purpose is not known, furnish an estimate and check the box to the left of the estimate. The total of the payments listed must equal the adjusted gross proceeds to the issuer set forth in response to Part C - Question 4.b. above.

$ 108,555,000

| | | Payments to Officers, Directors, & Affiliates | | | Payments To Others |
|---|---|---|---|---|---|
| Salaries and Fees | ☐ | $ 0 | ☐ | $ | 0 |
| Purchase of real estate | ☐ | $ 0 | ☐ | $ | 0 |
| Purchase, rental or leasing and installation of machinery and equipment | ☐ | $ 0 | ☐ | $ | 0 |
| Construction or leasing of plant buildings and facilities | ☐ | $ 0 | ☐ | $ | 0 |
| Acquisition of other businesses (including the value of securities involved in this offering that may be used in exchange for the assets or securities of another issuer pursuant to a merger) | ☐ | $ 0 | ☐ | $ | 0 |
| Repayment of indebtedness | ☐ | $ 0 | ☐ | $ | 0 |
| Working capital | ☐ | $ 0 | ☐ | $ | 0 |
| Other (specify): **Investment Capital** | ☐ | $ 0 | ☐ | $ | 0 |
| Column Totals | ☐ | $ 0 | ☑ | $ | 108,555,000 |
| | ☐ | $ 0 | ☑ | $ | 108,555,000 |
| Total Payments Listed (column totals added) | | ☑ $ | | 108,555,000 | |

## D. FEDERAL SIGNATURE

The issuer has duly caused this notice to be signed by the undersigned duly authorized person. If this notice is filed under Rule 505, the following signature constitutes an undertaking by the issuer to furnish to the U.S. Securities and Exchange Commission, upon written request of its staff, the information furnished by the issuer to any non-accredited investor pursuant to paragraph (b)(2) of Rule 502.

| Issuer (Print or Type) Goldman Sachs TXU Investors, L.P. | Signature K.B.Enquist | Date November 30, 2007 |
|---|---|---|
| Name of Signer (Print or Type) Katherine Enquist | Title of Signer (Print or Type) Vice President of the Issuer's General Partner | |

## ATTENTION

Intentional misstatements or omissions of fact constitute federal criminal violations. (See 18 U.S.C. 1001).

END

SEC 1972 (2-97)



haynes*boone*

March 26, 2008

**Via Facsimile and U. S. Mail**

William A. Brewer III, Esq.
Bickel & Brewer
4800 Bank One Center
1717 Main Street
Dallas, Texas 75201

Objection to Disclosure of Confidential Information

Dear Bill:

As you know, our firm represents Tom Hunt as Trustee of the Haroldson L. Hunt, Jr. Trust Estate ("HLHJrTE") and as Trustee of the Margaret Hunt Trust Estate ("MHTE"). Mr. Hunt also serves as the Executor of the Estate of Haroldson L. Hunt, Jr. Our client has received a copy of the Original Petition for Construction of Last Will and Testament that you have filed on behalf of your client, Albert G. Hill III, in Probate Court No. 2 in Dallas County in connection with the Estate of Haroldson L. Hunt, Jr. We object to exhibits that you have attached to your Petition.

In particular, we object to your inclusion of Exhibit N because it contains the Social Security numbers of Tom Hunt and Haroldson L. Hunt, Jr. You did not obtain authorization to disclose this highly confidential personal information. We also note that Exhibit P to your Petition contains Social Security numbers of several other Hunt family members. Neither Exhibit N nor Exhibit P are necessary to the claims asserted in your Petition. Your public filing of documents containing highly confidential personal information is not only unnecessary, it is irresponsible. Therefore, we request that you immediately take steps to have the confidential Social Security numbers reflected in the exhibits to your Petition redacted and/or sealed in the Court's files.

We expect you to take corrective action immediately including seeking the return of all copies of these documents made available to third parties; if not, we will seek relief with the Probate Court.

Sincerely,

George W. Bramblett, Jr.
*Direct Phone Number: (214) 651-5574*
*Direct Fax Number: (214) 200-0374*
*george.bramblett@haynesboone.com*

GWB/tdw

cc:    Patrick Shaw, Esq. . – *Via Facsimile*
       William B. Chaney, Esq. – *Via Facsimile*

D-1632358_4.DOC

218    000325

Haynes and Boone, LLP
Attorneys and Counselors
901 Main Street, Suite 3100
Dallas, Texas 75202-3789
Phone: 214.651.5000
Fax: 214.651.5940
www.haynesboone.com

# Godwin|Pappas|Ronquillo LLP

BRUCE W. BOWMAN, JR.
BOARD CERTIFIED - CIVIL TRIAL LAW -
TEXAS BOARD OF LEGAL SPECIALIZATION
DIRECT DIAL:     214.939.8679
DIRECT FAX:     214.527.3104
BBOWMAN@GODWINPAPPAS.COM

DALLAS   HOUSTON

*Attorneys and Counselors*

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214 939 4400
800 662 8393
214 760 7332 Fax

GodwinPappas.com

April 1, 2008

**VIA E-MAIL AND REGULAR MAIL**
Mr. William A. Brewer, III
BICKEL & BREWER
4800 Bank One Center
1717 Main Street
Dallas, Texas 75201-4651

Re:     Privacy Rights

Dear Bill:

I am mystified that you have not responded to my last request dated March 25, 2008. By taking no action on this issue, you and your client are continuing to expose my clients to substantial risk by leaving their social security numbers on file in Probate Court No. 2 in Dallas County, Texas. The fact that you have not made any effort whatsoever to redact or seal their social security numbers is unconscionable, especially in today's world rife with identity theft. Instead, you apparently told George Bramblett you will not oppose a motion to seal, which does not constitute any action on your part to rectify the unfortunate situation which you have created. We can only presume that because you have not even responded as to whether you have disseminated the information to others, that you have in fact caused the information to be disseminated to others, but have chosen not to let us know to whom the information was disseminated, for what purposes it was disseminated and when it was disseminated.

Your previous and current actions continue to place our clients at risk, which as you are well aware, is completely unacceptable. Rather than continuing to ignore the situation, I again ask that you take immediate action to rectify the problem that you and your client have created and respond to my previous request. As you know, there are daily reports in the news about identity theft caused by stolen social security numbers; the fact that you would assist in dissemination is baffling.

Very truly yours,

Bruce W. Bowman, Jr.

BWB:tb
cc:     Donald E. Godwin – *via interoffice*

D 1451740v.1 23444/0004

218    000330

CAUSE NO. PR-08-830-P2

IN RE:                                    §    IN THE PROBATE COURT
                                          §
ESTATE OF HAROLDSON L.                    §    NO. 2
HUNT, JR.                                 §
      Deceased                            §
                                          §
                                          §    DALLAS COUNTY, TEXAS

## TEMPORARY ORDER SEALING EXHIBITS N AND P TO PETITIONER'S ORIGINAL PETITION

Respondent, Tom Hunt, in his capacities as (i) Executor of the Estate of Haroldson L. Hunt, Jr., Deceased, (ii) Trustee of the Haroldson L. Hunt, Jr. Trust Estate, and (iii) Trustee of the Margaret Hunt Trust Estate (hereinafter collectively referred to as "Respondent"), filed a Motion to Temporarily and Permanently Seal Exhibits N and P to Petitioner's Original Petition under Texas Rule of Civil Procedure 76a. At a hearing before the Court, Respondent proved a compelling need for a temporary sealing order and demonstrated that delay in sealing would result in immediate and irreparable harm to his personal well-being.

Therefore, the Court hereby orders that Exhibits N and P to Petitioner's Original Petition for Construction of Last Will and Testament are sealed until the Court hears Respondent's Motion to Permanently Seal Court Records. Further, the Court orders that Respondent's Motion to Permanently Seal Court Records shall be heard in open court on ~~April~~ *May* 20, 2008, at 2:00 o'clock p.m.

Finally, Respondent shall give the public notice, as required by Texas Rule of Civil Procedure 76a(3).

ORDERED on this 15 day of April, 2008.

_____
HONORABLE JUDGE PRESIDING

CAUSE NO. PR-08-830-P2

IN RE:

ESTATE OF HAROLDSON L.
HUNT, JR.
 Deceased

§
§
§
§
§
§

IN THE PROBATE COURT

NO. 2

DALLAS COUNTY, TEXAS

NOTICE OF HEARING ON
RESPONDENT'S MOTION TO PERMANENTLY SEAL EXHIBITS N AND P TO
PETITIONER'S ORIGINAL PETITION

Please take note that a hearing on Respondent's Motion to Permanently Seal Exhibits N and P to Petitioner's Original Petition (hereinafter the "Motion") in the above entitled action will be held in open court, in the Probate Court No. 2, Dallas County, Texas, on the 20th day of May, 2008, at 2:00 p.m. Any person may intervene and be heard concerning the sealing of the court records.

This lawsuit involves Petitioner Albert G. Hill, III's ("Petitioner") request to be declared a beneficiary of the Haroldson L. Hunt, Jr. Trust Estate ("HLHJrTE"), and Petitioner's further requests that Respondent, Tom Hunt, in his capacities as (i) Executor of the Estate of Haroldson L. Hunt, Jr., Deceased (the "Estate"), (ii) Trustee of the Haroldson L. Hunt, Jr. Trust Estate, and (iii) Trustee of the Margaret Hunt Trust Estate, take certain actions relating to the Estate.

On March 7, 2008, Petitioner filed his Original Petition for Construction of Last Will and Testament (the "Petition") with several exhibits including the Estate's Internal Revenue Service Form 706 Tax Return, attached as Exhibit N, and a draft private letter ruling request attached as Exhibit P. The exhibits contain the unredacted social security numbers for Respondent and the Decedent, as well as for non-parties Albert G. Hill, Jr., Alinda Wikert, James Wikert, Michael Wisenbaker, Sr., Lyda Hill, Elisa Summers, Heather Washburne, Michael Wisenbaker, Jr.,

NOTICE OF HEARING

PAGE 1

20-10340.1364

Wesley Wisenbaker, Cody Wikert, and Margetta Wikert. Neither Petitioner nor his counsel sought or received permission to publish this highly confidential and sensitive information.

Pursuant to the Temporary Order Sealing Exhibits N and P to Petitioner's Original Petition, attached hereto as Exhibit A, Exhibits N and P have been placed under seal. Pursuant to Texas Rule of Civil Procedure 76a, Respondent moves the Court to permanently seal Exhibits N and P to Petitioner's Original Petition to protect the highly confidential and sensitive personal information, which is contained therein.

Posted at the Dallas County Criminal District Courthouse, Frank Crowley Courts Building, in Dallas, Texas, where notices for meetings of county governmental bodies are required to be posted, on this 15th day of April, 2008.

Respectfully submitted,

HAYNES AND BOONE, LLP

George W. Bramblett, Jr.
State Bar No. 02867000
901 Main Street, Suite 3100
Dallas, Texas 75202
Telephone: 214-651-5000
Facsimile: 214-651-5940
george.bramblett@haynesboone.com

ATTORNEYS FOR RESPONDENT, TOM HUNT,
AS EXECUTOR OF THE ESTATE OF
HAROLDSON L. HUNT, JR., DECEASED, AND
AS TRUSTEE OF THE MARGARET HUNT AND
HAROLDSON L. HUNT, JR. TRUST ESTATES

NOTICE OF HEARING

20-10340.1365

WOODWARD & SHAW, P.C.

Patrick Shaw
State Bar No. 18138800
1111 Two Energy Square
4849 Greenville Avenue
Dallas, Texas 75206-4144
Telephone: 214-373-4090
Facsimile: 214-890-7628
pshaw@woodshawlaw.com

ATTORNEYS FOR RESPONDENT TOM HUNT,
AS EXECUTOR OF THE ESTATE OF
HAROLDSON L. HUNT, JR., DECEASED

LOOPER REED & McGRAW, P.C.

William B. Chaney
State Bar of Texas # 04108500
Suite 4100 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
214.954.4135 (Phone)
214.953.1332 (Facsimile)
wchaney@lrmlaw.com

ATTORNEYS FOR TOM HUNT, AS
TRUSTEE OF THE MARGARET HUNT
AND HAROLDSON L. HUNT, JR. TRUST
ESTATES

D-1633667_6.DOC

NOTICE OF HEARING

PAGE 3



CERTIFICATION OF VITAL RECORDS

# CITY OF DALLAS, TEXAS
## VITAL STATISTICS DIVISION

STATE OF TEXAS          CERTIFICATE OF DEATH          STATE FILE NUMBER

Haroldson   Lafayette   Hunt   Jr.          Male          April 20, 2005

November 23, 1918          Lake Village / Arkansas          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

White          Producer          Oil Industry

4211 West Lawther          Dallas

Dallas          75218          ☒ YES   ☐ NO

Haroldson Lafayette Hunt          Lyda Bunker

Dallas          Dallas          4211 W. Lawther

Tom Hunt-Cousin/Executor          1601 Elm St. Ste. #700, Dallas, TX 75201

Hillcrest Memorial Park          Mont. E          Sparkman/Hillcrest
Dallas, Texas          April 25, 2005          7405 W. Northwest Hwy.
                                                Dallas, Texas 75225

Chief Medical Examiner          Found 3:00 P.

Jeffrey J. Barnard, M.D.   5230 Medical Center Drive   Dallas, TX 75235

Pending          Unknown

SEE ATTACHED AMENDMENT

APRIL 25, 2005          Lyda J. Humphrey

74-21-2005

4-20-2005

AMENDMENT TO MEDICAL CERTIFICATION OF CERTIFICATE OF DEATH

STATE OF TEXAS          STATE FILE NUMBER

Haroldson   Lafayette   Hunt   Jr.          April 20, 2005

Dallas, Dallas County, Texas

Chief Medical Examiner          Found 3:00 P.

Jeffrey J. Barnard, M.D.   5230 Medical Center Drive   Dallas, TX 75235

Complications of ventilatory therapy for quadriplegia          Unknown

blunt force injury of head and neck with cervical
spinal cord injury

4-20-05          2:50 P.M.          Residence

4211 W. Lawther          Dallas, TX

Fell and struck head.

02-03096          July 06, 2005          Lyda J. Humphrey



CAUSE NO. PR-0&830-P2

| IN RE: | § | IN THE PROBATE COURT |
| | § | |
| ESTATE OF HAROLDSON L. HUNT, JR., | § | NO. 2 |
| | § | |
| DECEASED | § | DALLAS COUNTY, TEXAS |

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

## ANSWER OF ALBERT G. HILL, JR.
## TO TRUSTEE'S MOTION FOR DIVISION OF TRUST

COMES NOW Albert G. Hill, Jr. ("Al Hill Jr.") and files this Answer to Trustee's Motion for Division of Trust filed February 4, 2009 by John W. Creecy as Successor Trustee of the Haroldson L. Hunt, Jr. Trust Estate ("Successor Trustee").

### I.    INTRODUCTION

John W. Creecy is the Successor Trustee of the Haroldson L. Hunt, Jr. Trust Estate ("HLHJrTE") which was established by H.L. Hunt and Lyda Hunt, the settlors, by Articles of Agreement and Declaration of Trust of the Haroldson L. Hunt, Jr. Trust Estate dated December 28, 1935 ("HLHJrTE Trust Agreement").

### II.

John W. Creecy, as Successor Trustee, has filed a Motion for Division of Trust into three portions. Those portions would be for Lyda Hill, Alinda Wikert, and Albert G. Hill, Jr. respectively, the three adult children of Margaret Hunt Hill. None of these three adult children of Margaret Hunt Hill has disclaimed, in whole or in part, his or her share of the Haroldson L. Hunt, Jr. Trust Estate. Accordingly, Al G. Hill, Jr. concurs with Successor Trustee Creecy, and asks the Court to divide the Trust into three separate and equal trusts, and one of the three trusts to be for the exclusive benefit of Al G. Hill, Jr. This is in accordance with the provisions of the HLHJrTE and the Last Will and Testament of Haroldson L. Hunt, Jr. admitted to probate May 9, 2005.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via facsimile upon the following counsel of record on this _28th_ day of April, 2008.

_Melissa Wandersee_

Melissa S. Wandersee

**VIA FACSIMILE: (214) 651-5940**

George W. Bramblett, Jr.
Haynes and Boone, LLP
901 Main Street, Suite 3100
Dallas, Texas 75202

**ATTORNEY FOR RESPONDENT,
TOM HUNT, AS EXECUTOR OF
THE ESTATE OF HAROLDSON L.
HUNT, JR., DECEASED; AS
TRUSTEE OF THE MARGARET
HUNT TRUST ESTATE AND
HAROLDSON L. HUNT, JR. TRUST
ESTATES**

**VIA FACSIMILE: (214) 890-7628**

Patrick Shaw, Esq.
WOODWARD & SHAW, P.C.
1111 Two Energy Square
4849 Greenville Avenue
Dallas, Texas 75206
Telephone: (214) 373-4090
Facsimile: (214) 890-7628

**ATTORNEY FOR RESPONDENT
TOM HUNT, AS EXECUTOR OF
THE ESTATE OF HAROLDSON L.
HUNT, JR, DECEASED.**

**VIA FACSIMILE: (214) 953-1332**

William B. Chaney, Esq.
Looper Reed & McGraw
Thanksgiving Tower
1601 Elm Street, Suite 4100
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332

**ATTORNEY FOR TOM HUNT,
AS TRUSTEE OF THE
MARGARET HUNT TRUST
ESTATE AND HAROLDSON L.
HUNT, JR. TRUST ESTATE**

**ALBERT G. HILL III'S AFFIRMATIVE DEFENSES AND ANSWER TO
TOM HUNT'S COUNTERCLAIMS—PAGE 4**
5156386.1
1979-01

CAUSE NO. **PR-08-830-P2**

| | | |
|---|---|---|
| IN RE: | § | **IN THE PROBATE COURT** |
| | § | |
| | § | |
| **ESTATE OF HAROLDSON L. HUNT, JR.,** | § | **NO. 2** |
| | § | |
| | § | |
| **DECEASED** | § | **DALLAS COUNTY, TEXAS** |

## AFFIDAVIT OF SERVICE

Came to hand on **Tuesday, March 11, 2008 at 1:40 PM,**
Executed at: **901 MAIN STREET, SUITE 2400, DALLAS, TX 75202**
within the county of **DALLAS** at 3:15 PM, on **Tuesday, March 11, 2008,**
by delivering to the within named:

### TOM HUNT

By delivering to his **Attorney Of Record, GEORGE BRAMLETT**
Each, in person a true copy of this

### CITATION and ORIGINAL PETITION FOR CONSTRUCTION OF
### LAST WILL AND TESTAMENT with EXHIBITS

having first endorsed thereon the date of the delivery.

**BEFORE ME,** the undersigned authority, on this day personally appeared **Danny L. Haney** who after being duly sworn on oath states: "My name is **Danny L. Haney.** I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Texas. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I am familiar with the Texas Rules of Civil Procedure, and the Texas Practice and Remedies Codes as they apply to service of process. I have never been convicted of a felony or of a misdemeanor involving moral turpitude."

**Danny L. Haney**

Of:  **Dallas County**

By:  _Authorized Person - SC566_

Given under my hand and seal of office on this __12^{TH}__ day of March, 2008.

_Notary Public in and for The State of Texas_



DWIGHT MULLEN
Notary Public, State of Texas
My Commission Exp. 08-20-2009

Respectfully submitted,

*Robert H. Thomas*

Robert Hyer Thomas
State Bar No. 19867000
STRASBURGER & PRICE, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202.3794
Telephone: 214.651.4300
Facsimile: 214.659.4161

*Attorney for Respondent Albert G. Hill, Jr.*

## CERTIFICATE OF SERVICE

On this the ___9___ day of ___FEBRUARY___, 2009, the foregoing document was served via facsimile upon the following counsel:

Justin M. Campbell, III
Campbell Harrison & Dagley, L.L.P.
4000 Two Houston Center
909 Fannin Street
Houston, Texas 77010
713.752.2330 (Fax)

Michael P. Lynn
Jeremy A. Fielding
Lynn Tillotson Pinker & Cox, LLP
750 N. St. Paul St., Suite 1400
Dallas, Texas 75201
214.981-3839 (Fax)

Donald E. Godwin
Bruce Bowman
Godwin Pappas Ronquillo LLP
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.527.3112 (Fax)

Frank Ikard
Ikard & Golden, P.C.
400 West 15th Street, Suite 975
Austin, Texas 78701
512.472.3669 (Fax)

George W. Bramblett, Jr.
Haynes & Boone, LLP
2323 Victory Avenue
Suite 700
Dallas, Texas 75219
214.651.5940 (Fax)

*Robert H. Thomas*

ROBERT H. THOMAS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was forwarded to the following counsel via U.S. certified mail, return receipt requested and via facsimile, on this /2ᵗʰ day of March, 2009:

Robert H. Thomas
Strasburger & Price, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202-3794
214.651.4330 (Fax)
**Counsel for Albert G. Hill, Jr.**

Frank Ikard
Ikard & Golden, P.C.
400 West 15th Street, Suite 975
Austin, Texas 78701
512.472.3669 (Fax)
**Counsel for Lyda Hill**

Donald E. Godwin
Bruce Bowman
Godwin Ronquillo PC
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.527.3112 (Fax)
**Counsel for Alinda Wikert**

Justin M. Campbell, III
Campbell Harrison & Dagley, L.L.P.
4000 Two Houston Center
909 Fannin Street
Houston, Texas 77010
713.752.2330 (Fax)
**Counsel for Albert G. Hill III**

Patrick Shaw
Woodward & Shaw, P.C.
4849 Greenville Avenue, Suite 1111
Dallas, Texas 75206
214.890.7628 (Fax)
**Counsel for Executor of Estate of Haroldson L. Hunt, Jr., Deceased**

Carrie L. Huff

D 1732336_1.DOC

NOTICE OF FILING BUSINESS RECORDS
AFFIDAVIT OF JOHN W. CREECY, TRUSTEE
OF THE HAROLDSON L. HUNT, JR. TRUST ESTATE

Page 3

CONSTABLE'S RETURN

Came to hand on the _____ day of _____, A.D. 20____ , at ____ o'clock ____M, and executed by
Delivering to _____ on the _____ day of _____ A.D. _____
at _____ o'clock ___M., the within named Defendant, in person, a true copy of this writ, together with a
copy of original petition with date of service marked thereon.

FEES:

Serving _____ $ _____

_____

County, Texas

Mileage _____ $ _____
Total _____ $ _____          By: _____, Deputy
Paid by _____

Attorney for _____
Address_____ Telephone _____

**.＊ SEE ATTACHED ＊＊**
**＊＊＊AFFIDAVIT ＊＊＊**

**＊＊ SEE ATTACHED ＊＊**
**＊＊＊AFFIDAVIT ＊＊＊**

CAUSE NO.: PR-08-830-P2

In Probate Court 2 of
Dallas County, Texas

ESTATE OF HAROLDSON L. HUNT, JR.,
DECEASED

ALBERT G. HILL, III ("HILL III" or
"PETITIONER"),
Plaintiff

TOM HUNT, AN INDIVIDUAL
Defendant
ISSUED
10 March 2008

JOHN F. WARREN
County Clerk, Dallas County, Texas

By: DARLENE BURRELL Deputy

Attorney for Plaintiff:
WILLIAM A. BREWER, III
1717 MAIN STREET, SUITE 4800
DALLAS, TEXAS 75201  214-653-4000

ORIGINAL





# NAMANHOWELL
## SMITH&LEE

Kuk J Stewart
Re: Mineral Lease
I.D. 33507-0003 – CBM

May 7, 2014
Invoice 365460
Page 3

| Date | Svs/Prov | Hours | Description | Amount |
|---|---|---|---|---|
| | | | attached document. | |
| 03/28/14 | JAR | 0.20 | Conference with Charles Mitchell and K. Copeland on case history and case handling, including contacting the respective oil and gas developers. | |
| 03/28/14 | PAR | 0.10 | Instructions from Mr. Mitchell regarding meeting with the Stewarts and the surveyor. | |
| 03/28/14 | CBM | 0.10 | Telephone conference with Marco Montemayer re: deeds and survey of property. | 35.00 |
| 03/28/14 | CBM | 0.10 | Telephone conference with Ken Stewart re: mineral lease. | 35.00 |
| 03/31/14 | CBM | 0.10 | Telephone conference with Marco Montemayer re: mineral lease. | 35.00 |
| 04/01/14 | PAR | 0.00 | Instructions from Mr. Mitchell regarding meeting with the surveyor. | |
| 04/01/14 | PAR | 0.00 | Instructions from Mr. Mitchell regarding letter to be finalized for Marco Montemayo regarding Kenny Stewart's vehicle damage. | |
| 04/03/14 | KMC | 0.40 | Receiving instructions and obtaining document: "Deed of Trust, Assignment of Leases, Security Agreement, Financing Statement and Fixture Filing." | |
| 04/03/14 | PAR | 0.00 | Instructions from Mr. Mitchell regarding documenting to be obtained by Ms. Copeland and forwarded to Mr. Montemayo. | |
| 04/03/14 | PAR | 0.00 | Instructions from Mr. Mitchell regarding the consensus report needed by Mr. Montemayo. | |
| 04/03/14 | PAR | 0.00 | Instruction to Ms. Copeland regarding documents consensus report need by Mr. Montemayo. | |
| 04/08/14 | JAR | 1.50 | Review correspondence with Scout and its attorney, lease and other real property and other documents related to the dispute over mineral lease (approximately 200 pages). | 412.50 |
| 04/08/14 | JAR | 0.50 | Research status of Scout entities and contact information for Chesapeake. | 137.50 |
| 04/08/14 | JAR | 0.50 | Draft letter for information on Scout lease to Scout and its attorney with comments on other possible courses of action to Charles Mitchell. | 137.50 |
| 04/08/14 | PAR | 0.00 | Review and evaluate email correspondence from Mr. Rivera regarding the correspondence to be sent to Scout Exploration. | |
| 04/09/14 | PAR | 0.00 | Review and evaluate e-mail correspondence with Mr. Rivera regarding the Notice letter to be sent to Scout Expiration and to Chesapeake. | |
| 04/10/14 | KMC | 0.40 | Discussing case assignment with Charlie Mitchell and finding land survey companies in Grand Prairie. | |
| 04/10/14 | KMC | 1.00 | Meeting with client. | 275.00 |



pro2H.t.beneficiary.jpg

PROBATE Page 1

Cause No. PR-08-00830-2

IN RE: ESTATE OF

HAROLDSON HUNT, JR.,

DECEASED

§
§
§
§
§

IN THE PROBATE COURT

NO. 2 OF

DALLAS COUNTY, TEXAS

February 26, 2018

To All:

# NOTICE OF HEARING

## AFFIDAVIT OF THE BENEFICIARY, HEIRSHIP INJUNCTION ON THE SALE OF ESTATE OF HAROLDSON L. HUNT

The above matter is set for hearing **April 19, 2017 at 9:30 am**, at Renaissance Tower, 1201 Elm Street, Suite 2200-A, Dallas, Texas 75270

Best regards,

Ingrid Warren
Judge of Probate Court #2
Dallas County, Texas

cc  Kenneth R. Stewart
2028 Sandy Lane
Irving, Texas 75060

cc  Haynes and Boone, LLP
Attn: Carrie L. Huff
2323 Victoria Avenue, Suite 700
Dallas, Texas 75219-5000

PR - 08 - 00830 - 2
NOTHRG
NOTICE OF HEARING
1/8914b





File   Edit   View   Favorites   Tools   Help

## Dallas Details

## Document

| Instrument # | Date Recorded | Date of Document | Doc Type | Bo Ty |
|---|---|---|---|---|
| 20070391139 | 10/31/2007 | I | DEED | ALL |

| Page Count | Recording Fees | Legacy | Completed |
|---|---|---|---|
| 5 | $0.00 | | 5 |

## Party

| Name | Role | Desigstatus |
|---|---|---|
| TXI OPERATIONS LP | Grantor | |
| TXI OPERATING TRUST | Grantor | |
| CHESAPEAKE LAND CO LLC | Grantee | |

## Legal

| Seq | Lot | Block | City Block | Map Book | Map Page | Map Instrument | Sub |
|---|---|---|---|---|---|---|---|
| 2 | | | | | | | MANSF INDUS |

100%  Views

PG 393 .... [-]

| ID | Date | Name | Role | Memorandum | | | City/Name | |
|---|---|---|---|---|---|---|---|---|
| 20070028318 | 01/24/2007 12:00:00 AM | TXI AVIATION I L L C | Grantee | MEMORANDUM OF LEASE | 0 | 0 | DALLAS CITY | |
| 20070026461 | 01/23/2007 12:00:00 AM | TXI AVIATION I L L C | Grantor | STATE TAX LIEN | 0 | 0 | TEXAS STATE | NO PROPERTY |
| 99178769 | 07/07/1999 12:00:00 AM | TXI CORP | Owner | ASSUMED NAME AN | | | TRANSPIPE PAC | |
| 97061608 | 05/29/1997 12:00:00 AM | TXI OPERATIONS LP | Owner | ASSUMED NAME AN | | | FAIRWAY SOLUTIONS | |
| 97031065 | 03/05/1997 12:00:00 AM | TXI OPERATIONS LP | Owner | ASSUMED NAME AN | | | EARTHEN TECHNOLOGIES | |
| 96059266 | 05/30/1996 12:00:00 AM | TXI OPERATIONS L.P. | Owner | ASSUMED NAME AN | | | TEC MINERALS | |
| 96059238 | 05/29/1996 12:00:00 AM | TXI OPERATIONS L.P. | Owner | ASSUMED NAME AN | | | TEXAS INDUSTRIES | |
| 3676204 | 08/04/2003 12:00:00 AM | TXI NAILS | Grantor | WITH A N | | | TU PHONG | |
| 2506120 | 04/08/2002 12:00:00 AM | TXI NAIL | Assumed name | ASSUMED NAME AN | | | TU PHONG T | |
| 262757 | 03/28/2000 12:00:00 AM | TXI | Assumed name | ASSUMED NAME AN | | | TXI OPERATIONS, LP | |
| 262757 | 03/28/2000 12:00:00 AM | TXI OPERATIONS, LP | Owner | ASSUMED NAME AN | | | TXI | |

2000   TXI   ASSUMED NAME BY TXI OPERATIONS, LP.

1996   Texas Industries Assumed TXI OPERATIONS, LP

1996   TEC Minerals Assumed TXI OPERATIONS, LP

EARTHEN TECHNOLOGIES
FAIRWAY Solutions

1999  TXI Corp   TRANSPIPE PAC

2007  TXI AVIATION I LLC ⌣ LEASE OF Love FIELD

20-10340.1155



Exhibit
M-1
1-1

# AFFIDAVIT OF OWNERSHIP

Marco A. Montemayor hereby swears that he is the owner of 23% of the estate belonging to Kenneth Robert Stewart Jr. and affirms that on January 10, 2014 an Authorized Agent Agreement was made and agreed to by Kenneth R Stewart Jr. and Marco A. Montemayor authorizing Marco A. Montemayor to gather information in regards to the estate of Kenneth R. Stewart Jr. which Kenneth R. Stewart Jr. had no knowledge of and for services provided Marco A Montemayor would be compensated and awarded with 25% ownership rights to every asset belonging to and having Kenneth R. Stewart Jr. interest including (Bonds, Deeds, Notes, Intercreditor Agreements, Securities, Chattel, any other documents used in financial capacity including the amended partnership agreement privileges, rights written therein such documents.

Marco A Montemayor Affirms that he is the Owner/ Holder/ Incidental 2nd Beneficiary as stated above in a 23% capacity and in regards to the (EIX TRUSTS I, II, III, INTERCREDITOR AGREEMENT, DECLARATION TO RAIBLE PLACE CHARITABLE TRUST, AND ANY OTHER DOCUMENT ) upon which is brought in this action. A copy of which is attached hereto and made a part hereof as fully as if set out herein.

The Owner further swears and affirms that the copy attached hereto is a true and correct copy of the original (Bond, Note, Intercreditor Agreement and or any other Document) is Certified by County Clerk where the asset being situated in.

SHANNON ALANIZ
My Notary ID # 130876851
Expires October 26, 2020

Notary Seal

10/10/19

10/10/2019

Marco A. Montemayor
Owner/ Partner of Beneficiary

14.1

20-10340.1014

**CONSTABLE**
DALLAS COUNTY
PRECINCT 4

CALL 8:00 A.M - 4:30 P.M., MON-FRI    **T. HAGENBUCH #43:**
GRAND PRAIRIE (214) 751-4065    DEPUTY

CASE #_____

$E$ File Rau-ws

DALLAS COUNTY CONSTABLE PCT 4
106 W CHURCH ST, STE 110
GRAND PRAIRIE, TX 75050